Daniel **SANTELICES**, on behalf of himself and all others similarly situated Plaintiffs

v.

**CABLE WIRING** and South Florida Cable Contractors, Inc., Defendants.

No. 98–7489–CIV.

United States District Court, S.D. Florida, Miami Division.

March 6, 2001.

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In *Celotex,* the seminal case concerning summary judgment, the Supreme Court explained that

> the plain language of Rule 56(c) *mandates* the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Id.* at 322–23, 106 S.Ct. 2548 (emphasis added). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A material fact is one that might affect the outcome of the case. *See id.* at 248, 106 S.Ct. 2505. For factual issues to be considered genuine, they must have a real basis in the record. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The moving party has the burden of showing the absence of a genuine issue as to any material fact; the burden then shifts to the nonmovant to come forward with specific facts on each essential element of his claims by showing that there is

Jonathan Evan Kroner, Mediator, Miami, for plaintiffs.

Neil F. McGuinness, Baker & McKenzie, Jill Nexon Berman, Berman Wolfe & Rennert, Miami, FL, for defendants.

## ORDER GRANTING IN PART AND DENYING IN PART SUMMARY JUDGMENT

JORDAN, District Judge.

Daniel Santelices sues Cable Wiring, Inc. and South Florida Cable Contractors, Inc. pursuant to the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 *et seq.* Mr. Santelices seeks to recover damages for unpaid overtime allegedly worked while in the defendants' employ.

### I. JURISDICTION

Mr. Santelices filed his complaint against CWI on December 29, 1998 [D.E. 1]. He amended his complaint, adding SFCC as a defendant, on April 13, 1999 [D.E. 17]. Jurisdiction exists pursuant to 29 U.S.C. § 216(b) and 28 U.S.C. § 1331. CWI and SFCC each move for final summary judgment on Mr. Santelices' claims. For the reasons explained below, CWI's motion for summary judgment [D.E. 57] is GRANTED, and SFCC's motion for summary judgment [D.E. 60] is DENIED.

### II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides for summary judgment when all "pleadings, depositions, answers to interrogatories, and admissions on file, together

a genuine issue for trial such that a reasonable jury could find in his favor. *See id.* "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Liberty Lobby, Inc.,* 477 U.S. at 252, 106 S.Ct. 2505.

In considering a motion for summary judgment, it is not part of the court's function to decide issues of material fact, but rather to determine whether such issues exist to be tried. *See id.* at 249, 106 S.Ct. 2505. The court must avoid weighing conflicting evidence and making credibility determinations. *See id.* at 255, 106 S.Ct. 2505. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in the nonmovant's favor. *See id.* Thus, in resolving the defendants' motions, the task is to determine whether, considering the evidence in the light most favorable to Mr. Santelices, the nonmoving party, there is evidence on which a jury could reasonably find a verdict in his favor. *See id.* at 252, 106 S.Ct. 2505; *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir.1997).

### III. The Parties' Positions

Mr. Santelices alleges that he was employed by CWI and SFCC as a cable installer for one or more workweeks between February and November ·of 1998 and that he was not properly compensated for hours he worked in excess of forty hours per workweek. CWI is a licensed cable installation vendor for TCI of South Florida. CWI is not related to, controlled by, or legally affiliated with SFCC as a parent or subsidiary company, nor does CWI have an ownership interest in SFCC. On January 1, 1998, CWI entered into an Independent Contractor's Agreement with SFCC ("the CWI–SFCC Agreement" [D.E. 60, Exh. 1] (Jan. 1, 1998)). Under the CWI–SFCC Agreement, SFCC agreed to perform residential cable installations in Miami–Dade and Broward Counties. Mr. Santelices was hired to perform cable installation services pursuant to the Agreement.

The defendants argue that Mr. Santelices was not hired by CWI in any capacity and was not hired by SFCC as an "employee" within the meaning of the FLSA, but was merely an independent contractor for SFCC. The defendants rely on cited excerpts from Mr. Santelices' deposition testimony (which reflects Mr. Santelices' understanding that he was an independent contractor), as well as the testimony of CWI's president Nick Karl, who says that CWI had no knowledge of Mr. Santelices prior to this lawsuit, no direct or indirect contact with him while he performed cable installation services for SFCC, and no control over SFCC's working relationship with Mr. Santelices. The defendants also rely on copies of: (1) Mr. Santelices' Independent Contractor's Agreement with SFCC; (2) Mr. Santelices' 1998 Individual Income Tax Return reflecting his operation of a cable installation business and self-employment; and (3) Mr. Santelices' affidavit of independent contractor status included in a worker's compensation exemption form filed with the State of Florida in July of 1997. The defendants further argue that even if Mr. Santelices were considered an "employee" within the meaning of the FLSA, he has not sufficiently demonstrated that he worked any overtime.

### IV. The FLSA

■ Congress enacted the FLSA in 1938 as a comprehensive remedial scheme to lessen, if not eliminate, the distribution in commerce of goods produced under deficient labor conditions. *See* 29 U.S.C. § 202(a). The elimination of low wages

and long hours was chosen as the method "to free commerce from the interferences arising from production of goods under conditions detrimental to the health and well-being of workers." *Rutherford Food Corporation v. McComb,* 331 U.S. 722, 727, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947). The Act imposes a minimum wage for covered employees, 29 U.S.C. § 206, requires that covered employers maintain records of their employees' services, 29 U.S.C. § 211(c), and prohibits employers from employing any worker for a workweek longer than forty hours unless the employee receives compensation for the excess hours at a rate not less than one and one half times the regular rate at which the worker is employed, 29 U.S.C. § 207(a)(1).

### A. EMPLOYEE OR INDEPENDENT CONTRACTOR

■ The first question is whether Mr. Santelices can be considered an "employee" of CWI and/or SFCC who is therefore entitled to protection under the FLSA. A determination of employment status under the FLSA is a question of law. *See Antenor v. D&S Farms,* 88 F.3d 925, 929 (11th Cir.1996); *Brouwer v. Metropolitan Dade County,* 139 F.3d 817, 818 (11th Cir.1998) (citing *Villarreal v. Woodham,* 113 F.3d 202, 205 (11th Cir.1997)). Subsidiary findings, however, are considered issues of fact. *See Patel v. Wargo,* 803 F.2d 632, 634 n. 1 (11th Cir.1986).

■ The FLSA vaguely explains what is meant by the term "employee." *Weisel v. Singapore Joint Venture, Inc.,* 602 F.2d 1185, 1188 (5th Cir.1979). For example, 29 U.S.C. § 203(e)(1) defines an "employee" as "any individual employed by an employer." An "employer," in turn, includes "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). To "employ" is defined as to "suffer or permit to work." 29 U.S.C. § 203(g). Whether an employment relationship exists under the FLSA must be judged by the "economic realities" of the individual case and not by traditional common-law principles. *See Antenor,* 88 F.3d at 929; *Donovan v. New Floridian Hotel,* 676 F.2d 468, 470 (11th Cir.1982). *See also Nationwide Mutual Insurance Co. v. Darden,* 503 U.S. 318, 325–26, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992) (explaining that the definition of employ in the FLSA is expansive and collecting cases). The touchstone of "economic reality" in analyzing a possible employee/employer relationship for purposes of the FLSA is *dependency.* The courts look at all of the surrounding circumstances of the "whole activity" to determine whether the putative employee is economically dependent upon the alleged employer. *Goldberg v. Whitaker House Co-op., Inc.,* 366 U.S. 28, 33, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961); *Aimable v. Long & Scott Farms,* 20 F.3d 434, 439 (11th Cir. 1994); *Harrell v. Diamond A Entm't, Inc.,* 992 F.Supp. 1343, 1348 (M.D.Fla.1997). Whether or not the parties intended to create an employment relationship is irrelevant. *See Donovan,* 676 F.2d at 471 (citing *Brennan v. Partida,* 492 F.2d 707, 709 (5th Cir.1974)). Likewise, merely labeling an individual as an employee or an independent contractor is not dispositive. *See Rutherford Food,* 331 U.S. at 729, 67 S.Ct. 1473 ("Where the work done, in its essence, follows the usual path of an employee, putting on an 'independent contractor' label does not take the worker from the protection of the Act."). In other words, courts look to see whether the putative employee depends (or depended) on the alleged employer for his economic livelihood based upon the parties' actual working relationship. *Antenor,* 88 F.3d at 937–38.

In applying the "economic realities" test, the courts have identified a number of factors which are useful in distinguishing employees from independent contractors. These factors include:

(1) the nature and degree of control of the workers by the alleged employer;

(2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;

(3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers;

(4) whether the service rendered requires a special skill;

(5) the degree of permanence of the working relationship; and

(6) whether the service rendered is an integral part of the alleged employer's business.

*Real v. Driscoll Strawberry Assocs., Inc.,* 603 F.2d 748, 754 (9th Cir.1979) (footnote omitted). No one factor is controlling; nor is the list exhaustive. The factors simply summarize the matters deemed relevant by the Supreme Court in *Bartels v. Birmingham,* 332 U.S. 126, 130, 67 S.Ct. 1547, 91 L.Ed. 1947 (1947), *United States v. Silk,* 331 U.S. 704, 716, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947), and *Rutherford Food,* 331 U.S. at 729, 67 S.Ct. 1473, to help gauge the degree of *dependence* of an alleged employee on the business with which they are connected. The weight of each factor depends on the light it sheds on the putative employee's dependence on the alleged employer, which in turn depends on the facts of the case. *See Antenor,* 88 F.3d at 933.

A review of each of these factors reveals that a material issue of fact exists with regard to the amount of control SFCC exerted over Mr. Santelices' activities during the alleged period of employment and whether Mr. Santelices falls within the protections of the FLSA. The record also shows that the amount of supervision or control exerted by CWI over Mr. Santelices does not implicate employee status under the FLSA.

Mr. Santelices relies in large part on certain portions of the CWI–SFCC Agreement in arguing that both CWI and SFCC acted as his joint employer. For example, the Agreement requires SFCC to use care and diligence in hiring and retaining employees, and repeatedly refers to SFCC's "employees." CWI–SFCC Agreement ¶¶ 3,4,7–11,13,15,16. The Agreement also provides, however, that SFCC pay its "employees" according to the terms of the contractual relationship between SFCC and its workers. *Id.* ¶ 8. This contractual language arguably supports an inference of an employment relationship between Mr. Santelices and SFCC, but not between CWI and Mr. Santelices. In fact, the Agreement specifically provides that SFCC's employees are not employees of CWI. *Id.* ¶¶ 4, 9. Nevertheless, the CWI–SFCC Agreement does not satisfy the "economic realities" test, which requires that the court consider all the circumstances of the parties' actual working relationship. *See Rutherford Food Corp.,* 331 U.S. at 730, 67 S.Ct. 1473.

## B. MR. SANTELICES AND SFCC

SFCC adopts CWI's motion in its entirety, but fails to address whether it exercised control over Mr. Santelices' work. Instead, SFCC relies on CWI's attempt to highlight those aspects of Mr. Santelices' working relationship that portray him as an independent contractor, such as Mr. Santelices' written agreement to work as an independent contractor, his specialized skill of cable installation, his significant investment in tools and equip-

ment, his filing of a separate tax return for his installation business, his maintenance of his own liability insurance, his application for exemption from the state's workers compensation laws, the fact that he was assigned a federal employer identification number, and the fact that SFCC did not provide him employment benefits.

Mr. Santelices disputes the defendants' version of the facts, however, and contends that he did not operate as an independent businessman. *See Mednick v. Albert Enters., Inc.,* 508 F.2d 297, 301–02 (5th Cir. 1975) (explaining that the concept of economic dependency is also considered in terms of whether the individual is "in business for himself"). He argues that he and the other cable installers were required to work to the defendants' specifications, and that the defendants actually exert a greater degree of control over the installers' activities than they acknowledge.

Several attributes of Mr. Santelices' work support characterizing him as an independent contractor. His work requires the application of a special skill to properly install digital cable. This skill includes the ability to competently connect cables from a main feed outside into a home (to the television set and VCR) run cables in between walls, bury cable lines underground, and install converter boxes. Mr. Santelices testified that he also learned the more technical side of cable installation, including construction work with cable, underground fiber, splicing taps, and making new systems. *See* Deposition of Daniel Santelices at 11, 23 [D.E. 66] (Sept. 29, 1999). Mr. Santelices testified that he was required to demonstrate his special skill, his ability to satisfy TCI technical specifications in performing digital/cable work, by participating in a day-long digital cable installation training class at TCI under TCI's supervision. Mr. Santelices was required to pass a written exam and physi-

cally demonstrate his proficiency at digital cable installations. *See id.* at 66–67. Furthermore, a cable installer in today's market is considered a skilled tradesman. *See, e.g., T & T Communications, Inc. v. Florida Dep't of Labor & Employment Sec.,* 460 So.2d 996, 998 (Fla. 2d DCA 1984) (holding that "cable installers are skilled tradesmen"); *Dole v. Amerilink Corp.,* 729 F.Supp. 73, 77 (E.D.Mo.1990) ("[T]he [cable] installers possess the special skills of carpenters and electricians.").

Mr. Santelices invested a significant amount of money in his work tools and equipment, further supporting the proposition that he was an independent contractor. Mr. Santelices invested approximately $850 for tools, including pliers, cutters, krimpers, drills, electric drills, screwdrivers, terminator tool, and fish tape. He purchased his own pick-up truck for $6,000 which was equipped to carry his toolbox and tools and a mounted ladder. He also purchased his own pager so that customers could reach him, and paid the bills for use of the pager. *See* Santelices Deposition at 61. Mr. Santelices admitted, however, that SFCC provided him with certain tools not available on the open market and which were dedicated for the TCI system. *See id.* at 34–36.

Mr. Santelices also admits to maintaining his own general liability insurance and having applied for a federal employer's identification number ("FEIN"). He contends that he was pressured by the cable companies from which he sought work to obtain a FEIN and apply for exemption under the state workers compensation laws, explaining that he would be denied work if he failed to do so. *See id.* at 44–47. He was also paid on a per job basis. *See id.* at 182.

Evidence also exists, however, that supports an employment relationship. For example, because SFCC's work was to

complete residential cable installation services in Broward and Miami–Dade Counties, Mr. Santelices' cable installation was an integral part of SFCC's work. *See Rutherford Food Corp.*, 331 U.S. at 729, 67 S.Ct. 1473. Mr. Santelices has also presented evidence, set forth below, showing "specific indicia of control" by SFCC over his daily employment activities. *See Aimable*, 20 F.3d at 440 (holding that the control factor is properly limited to "specific indicia of control (for example, direct employment decisions such as whom and how many employees to hire, whom to assign to specific tasks, and how to design the employees' management structure)"). *See also Antenor*, 88 F.3d at 933–34 (discussing the role control plays in drawing distinctions between employees and independent contractors).

As evidence of SFCC's control, Mr. Santelices testified that he reported each work day to a warehouse operated by SFCC, and that his supervisor at the warehouse determined the starting times each day. If he wanted a work assignment, he was required to report for work at 6:30 a.m. "[I]t was verbally said to the whole company by the supervisor that's what time you had to be there." Santelices Deposition at 111–12. Mr. Santelices believed that he would be fired for any absence, and testified that "a couple guys got fired for not showing up." *Id.* at 113. Mr. Santelices testified that he would be reprimanded or denied work if he arrived late, and recalled instances where people were reprimanded or suspended for arriving late. *See id.* at 113–14. Mr. Santelices testified that when an installer failed to arrive on time, his routes were reassigned to other installers, who were required to perform the extra work. He claims he could not turn down work, and understood that if he refused extra work orders, he would be penalized. *See id.* at 114, 146.

Mr. Santelices also stated that when he was working for "the company" (whose warehouse location is operated by SFCC and is now understood as SFCC, *see id.* at 224), he was not at liberty to complete the assigned installation jobs on his own schedule, but had to adhere to certain time frames established by SFCC. The SFCC supervisor distributed the routes with specific time frames in which to perform the assigned jobs, e.g., 8 to 11 a.m., 11 to 2 p.m., 1 to 4 p.m., 2 to 5 p.m., and 4 to 7 p.m. The time frames were taken from the work orders provided by TCI. *See id.* at 53. Although Mr. Santelices was permitted to adjust his daily schedule if he were running late or ran into an unexpected delay, and he did so on occasion, he generally adhered to SFCC's provided time frames. At these times, either he called the customer directly or the company called the customer to advise the customer that he was behind schedule. Regardless of whether he or the company called, appointments were scheduled or rescheduled through TCI or SFCC.

Mr. Santelices also testified that the manner in which he performed his work was according to specifications provided him by "the company." He understood that to keep his job, he must follow the specifications. *See id.* at 181. Mr. Santelices was required to maintain periodic communication with the company throughout the day by using the company's two-way radio. The purpose of the radio was to keep in touch with the dispatcher, to report updates and completions on jobs, to report "not homes," and, if need be, to request assistance from another installer. *See id.* at 89. A monthly charge of twelve dollars was deducted from his pay check for use of the radio. *See id.* at 88. *See also Burgess v. NaCom Cable Co.*, 923 S.W.2d 450, 453 (Mo.Ct.App.1996) ("Periodic communication with radio dispatch throughout the day is a clear emblem of

control and [a] scheduling benefit to Na-Com [cable company/employer].")

Importantly, Mr. Santelices asserts that after working with the company for about a month, he was given extra duties. The extra duties included assisting in the distribution of installation materials (cable, wire, clamps, splitters), making copies of work orders, assigning digital boxes, and cleaning up around the office. *See* Santelices Deposition at 141–46. Mr. Santelices testified that these tasks were unique to him as a cable installer; no other installer was given these extra duties. *See id.* at 142. He was told by his supervisor that he would be paid fifty dollars weekly to perform these other tasks. *See id.* at 143.

Mr. Santelices further testified that although he paid for and maintained his own general liability policy and filed for a worker's compensation exemption, SFCC deducted 7% from every paycheck for his coverage under its general liability insurance policy and deducted monies from his paycheck for workers compensation. *See id.* at 73, 122, 202.

Furthermore, although the defendants contend that Mr. Santelices had the ability to control his revenues and earn more money by performing additional services at the customer's request, Mr. Santelices' testimony indicates that this control was limited. He was first required to perform the service listed on the work order. Only *if time permitted* could he then perform additional cable services. *See id.* at 99–100. Before installing a cable box not indicated on a work order, Mr. Santelices claims he was required to seek permission from the company [SFCC] which would in turn obtain authorization from TCI. *See id.* at 97–98.

Although the defendants contend that Mr. Santelices had the freedom to move from SFCC to another cable company and return to SFCC, the independent contrac-tors' agreement ("Santelices Agreement") indicates that Mr. Santelices was required to personally perform services exclusively for SFCC during the course of each assigned program: "Contractor agrees to complete each assigned program. During the course of the program contractor's services will only be provided to SFCC." Santelices Agreement ¶ B [D.E. 60, Exh. 3] (Sept. 5, 1998). Mr. Santelices also agreed to "work diligently and with his best efforts to market and otherwise promote the services of SFCC." *Id.* ¶ A.

Mr. Santelices also asserts that contrary to the defendants' position, he did not operate as an independent businessman. According to his deposition testimony, the money Mr. Santelices collected from customers were not for himself, but ultimately for TCI (excluding tips). He did not send out bills or prepare any contracts between himself and a customer. *See* Santelices Deposition at 227. He also testified that he did not advertise, market, or keep books for his services; nor did he send out correspondence to customers. *See id.* at 228. Mr. Santelices also asserts that he did not develop business or jobs on his own that did not originate from SFCC or TCI. *See id.* at 92. Even if he had, this would likely conflict with the requirement that he work exclusively for SFCC during the course of each assigned program.

The defendants argue that Mr. Santelices "spoke with SFCC" about the prices that he would charge for specific installation services, implying that Mr. Santelices had the opportunity to negotiate those prices. But Mr. Santelices contends that he did not have such liberty. He testified that the prices quoted to customers were those provided him by SFCC, *see id.* at 93–94, and that the supervisor at SFCC provided him with a price list indicating the payment he would receive for each task. *See id.* at 37.

Mr. Santelices claims that he was not at liberty to hire his own helpers as a true independent contractor could do. If he needed help on a job, he was required to get permission from SFCC, and provide the name of an installer to call. *See id.* at 65, 89; Santelices Agreement ¶¶ B, E. If he did use another installer on a job, the company split the job and paid each installer his or her individual share. *See id.* at 216.

Mr. Santelices also testified that beginning in September of 1998, he accepted a quality control position with the company. He claims he met with his superiors at SFCC and they agreed to a different compensation structure, a weekly base salary plus compensation for all the jobs he had to "fix." As part of his new duties, Mr. Santelices testified that his work hours did not change, but his job duties were to check the installation jobs and ensure compliance with TCI's specifications. *See id.* at 138–39, 146–48, 151.

The evidence Mr. Santelices has provided, taken with his deposition testimony, presents a material issue of fact regarding the nature and degree of control exerted over him by SFCC. For purposes of determining economic dependency, the issue of control is only significant when it shows that an individual exerts such control over "a meaningful part" of their business that they stand as "a separate economic entity." *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1312–13 (5th Cir.1976). Mr. Santelices has presented sufficient evidence to suggest that not all meaningful aspects of his installation "business"—advertising/marketing, customers, prices, and payment arrangements—were controlled by him.

The defendants encourage me to adopt the district court's holding in *Dole*, 729 F.Supp. at 73, which involved similar issues. In *Dole*, the Secretary of Labor instituted an FLSA suit against a cable television corporation alleging that the corporation violated minimum wage and overtime requirements with regard to its cable installers. After a bench trial, the court found that certain cable television installers working for a cable television corporation were independent contractors to whom the protections of the FLSA did not extend. The instant case, however, is easily distinguishable on its facts from *Dole* in terms of the amount of control the cable company exerted over the installers for Amerilink. For instance, in *Dole*, the installers had complete control over the hiring, firing, paying and otherwise directing of helpers. Some of the Amerilink installers employed helpers on a regular basis. The cable company did not enter into those negotiations and arrangements in any way. *Id.* at 75. The installers also picked out their routes, set their own hours, and created an overall impression of economic independence from the company. There was also no evidence in *Dole* that the installers were required to maintain periodic communication with the cable company throughout the workday via two-way radio, or to perform additional duties for the company as Mr. Santelices did.

### C. MR. SANTELICES AND CWI

CWI argues that it had no knowledge of Mr. Santelices prior to this lawsuit, no contact with him while he performed installation services for SFCC, and that it did not hire him in any capacity. CWI also asserts that it did not exercise any control over any aspect of Mr. Santelices' services for SFCC. Mr. Santelices, however, attempts to confer employment status on CWI and demonstrate CWI's control over his cable installation activities by asserting several theories.

First, Mr. Santelices argues that CWI produced, provided, and required the bill-

ing forms he used. Mr. Santelices relies on his deposition testimony that his supervisor Juan, to whom Mr. Santelices first reported at the warehouse, provided him with the billing forms. Mr. Santelices has not provided any evidence, however, to link Juan or the forms to CWI, and no such forms have been submitted as evidence.

Second, Mr. Santelices argues that the fact that a CWI supervisor gave him a Cable Wiring Inc. shirt demonstrates CWI's control. Mr. Santelices testified that a CWI shirt was given to him by one of his supervisors at SFCC for helping out around the office. He occasionally wore it to work. However, he was never told that he was required to wear the shirt on the job. *See* Santelices Deposition at 128–30. In fact, at his deposition, Mr. Santelices testified that his prior sworn statement, that he was required to wear the CWI shirt as part of his uniform, was false. Mr. Santelices also testified that the installers were provided with and required to wear a t-shirt which had a drawing of a cable installer and read "cable contractor." *See id.* at 169. Thus, the fact that Mr. Santelices was given a CWI shirt by an SFCC supervisor is not probative of CWI's control.

Mr. Santelices also argues that CWI's provision of identification cards is evidence of control. Mr. Santelices' testimony reveals that the only time he reported to a CWI operated facility was on one occasion, one week after having started work, to obtain his cable installer's photo identification card. At that time, Mr. Santelices met only with a CWI secretary. Further, the card identified Mr. Santelices as a "contractor for TCI." *See id.* at 75–76, 85, 221. This solitary visit is likewise not probative of CWI's control.

Mr. Santelices further argues that his lack of authority to install additional cable outlets without calling TCI, was presumably at the instruction of both the defendants, and shows CWI's control. Mr. Santelices has again failed to produce any evidence to substantiate CWI's control or direct involvement in obtaining authority to install additional outlets. Further, Mr. Santelices testified that the ultimate authority in this type of situation came from TCI. *See id.* at 98.

Mr. Santelices also argues that the fact that he performed installations according to CWI's technical specifications is indicative of control. Mr. Santelices has not provided any evidence to support the allegation that he performed installations according to CWI's technical specifications; although there is ample evidence showing that he was required to perform installations according to TCI's technical specifications. *See id.* at 52, 66, 69. In support of this argument, Mr. Santelices relies on the agreement he executed with SFCC, which required him to "work within the guidelines and rules set down by the company." Santelices Agreement ¶ D. The reference to "the company," as contained in this written document, clearly refers to SFCC.

As evidence of an employment relationship, Mr. Santelices also asserts that he worked permanently and exclusively for the defendants in that he was not permitted to work for other cable companies as an installer during his putative employment. Yet Mr. Santelices has failed to present any evidence to substantiate this assertion with regard to CWI.

Mr. Santelices further argues in favor of an employment relationship on the basis that he performed a task allegedly integral to CWI's business. This theory of economic dependency, however, is overbroad and can be easily analogized to the laborer/land owner relationship discussed

by the Eleventh Circuit in *Aimable,* 20 F.3d at 439. In *Aimable,* a group of migrant and seasonal farm workers suing under the FLSA and the Migrant Seasonal Agricultural Worker Protection Act ("MSAWPA") attempted to confer joint employment status on both the land owner and the farm labor contractor who hired the workers and maintained direct daily contact with them. *Id.* at 437. Although the court agreed that the labor contractor who made direct decisions regarding the laborers' employment, compensation, and specific tasks assigned, was the laborers' employer, it refused to confer such status on the land owner. *See id.* at 440. The court reasoned that although the land owner's planting decisions, such as which land parcels to harvest, the time for harvesting, number of times to harvest, ultimately affected the exact amount of work available, this abstract type of control, which only indirectly affected the workers, was not the type of direct control envisioned by the FLSA or the MSAWPA. *See id.* at 440–41. The landowner's business was to grow and sell vegetables. The labor contractor's job was to provide a sufficient number of laborers to harvest the vegetables. The court explained that

> [c]ontrol arises, we believe, when the [owner] goes beyond general instructions, such as how many acres to pick in a given day, and begins to assign specific tasks, to assign specific workers, or to take an overly active role in the oversight of the work.

*Id.* at 441. Mr. Santelices has failed to provide any evidence to show CWI's direct or daily control over his cable installation work. *See* Santelices Deposition at 80.

▄▄▄ Mr. Santelices finally argues that he had little opportunity to realize a profit because he was actually marketing for CWI. Mr. Santelices was required to post a magnetic sign on his truck which read

"CABLE WIRING INC. COMMUNICATIONS CONTRACTOR" and included CWI's phone and license numbers. Mr. Santelices was required to pay a refundable $40 security deposit to the SFCC office for his use of the sign on his truck, which he understood was necessary to avoid being cited by the City. *See id.* at 166–68. CWI's requirement that Mr. Santelices display the sign is relevant to CWI's purported control over Mr. Santelices. This evidence, though, is only one isolated factor, and it fails to tip the scale in favor of an employment relationship when the "circumstances of the whole activity" are considered. The determination of whether an employer-employee relationship exists does not depend on "isolated factors but rather upon the circumstances of the whole activity." *Rutherford Food,* 331 U.S. at 730, 67 S.Ct. 1473. Aside from the use of this sign, Mr. Santelices has not submitted any other evidence showing Mr. Santelices' purported economic dependency on CWI.

In sum, with regard to CWI's purported control, Mr. Santelices has not provided sufficient evidence showing either "specific indicia of control" by CWI over his cable installation services, or a sufficient link between CWI and SFCC's warehouse or any of the activities that originated from there. *See Aimable,* 20 F.3d at 440; *Antenor,* 88 F.3d at 933–34.

### D. CWI AS JOINT EMPLOYER

▄▄▄ Mr. Santelices also argues that CWI acted as his joint employer, meaning that he was economically dependent on both CWI and SFCC during the alleged period of employment. *See* 29 C.F.R. § 791.2(a) ("A single individual may stand in the relation of an employee to two or more employers at the same time under the FLSA ..."). To determine whether joint employment exists, courts consider

several relevant factors, including the putative employer's nature and degree of control of the workers, degree of supervision, direct or indirect of the work, power to determine the pay rates of methods of payment, right to directly or indirectly hire, fire, modify the employment conditions of the workers, preparation of payroll and payment of wages, ownership of facilities where work occurred, whether the worker performed a line job integral to the end product, and relative investment in equipment and facilities. *See Antenor*, 88 F.3d at 932 (citing *Aimable*, 20 F.3d at 440–46). Consideration of these factors, in light of the evidence presented, fails to show the existence of a joint employment relationship.

First, Mr. Santelices contends that CWI engaged in the same nature and degree of control found to be characteristic of a joint employer in *Antenor*, 88 F.3d 925. A thorough reading of *Antenor*, however, shows that Mr. Santelices' reliance is misplaced. *Antenor* (which is factually similar to *Aimable*, 20 F.3d at 434, discussed above), involved a group of seasonal agricultural workers who sued the landowners and labor contractor to enforce wage requirements under the FLSA and MSAWPA. The workers conferred joint employer status on both the labor contractor and the owners by showing substantial rather than "de minimis" oversight by the owners. *See Antenor*, 88 F.3d at 935. Concluding that the owners and labor contractors acted as the workers' dual employer, the Eleventh Circuit relied on the workers' showing that the owners actively oversaw and directly intervened in their work on a daily basis. *See id.* The owners decided how many workers were needed, and determined the precise moment when picking would begin. The workers also proved that the owners were free to delay or stop the workers, and did in fact order a work stoppage to verify the workers' compliance

with new immigration laws that went into effect. *See id.* at 934 n. 12. The owners also had the ability to, and did in fact, assign work to specific workers, and the owners as well as their staff would walk the fields each day and make sure the work was done properly; if there was a problem, they would bring it to the workers' attention. *See id.* at 935. The court found this type of supervision

> more substantial than the "infrequent assertions of minimal oversight" by the grower in *Aimable*, 20 F.3d at 441, where the grower's employees, "except on rare occasions, left supervision and oversight of the [the farmworkers] entirely to [the contractor] and his crew" and "rarely provided any direction to [the farmworkers'] work."

88 F.3d at 935. The owners also monitored the workers' job qualifications rather than relying on the labor contractor to do so, and deducted monies from the labor contractor's compensation in order to purchase worker's compensation insurance for the workers—naming themselves as the policy holders. *See id.* at 935–36.

Mr. Santelices has not provided any proof of control or supervision by CWI remotely resembling the substantial control and supervision characteristic of the growers in *Antenor*. Mr. Santelices simply argues that CWI inspected his cable installation work. Mr. Santelices' only evidence, however, is his testimony that his installation jobs were supposed to be done according to TCI specifications. *See* Santelices Deposition at 70. When asked whether anyone other than TCI inspected his work for compliance with the TCI manual, Mr. Santelices responded that "[w]e had also—Cable Wiring had a quality control person, too, that would also check jobs." Although Mr. Santelices could not recall this person's name, he indicates that it was "more Cable Wiring checking than

TCI." Assuming that Mr. Santelices was actually referring to CWI rather than "Cable Wiring" in the generic sense, Mr. Santelices was unable to answer as to the extent of the quality control person's oversight. In response to a query as to the number of jobs that were inspected, Mr. Santelices admitted, "I couldn't tell you." He speculated that "probably ten jobs out of the week from each person would be checked" by both TCI and Cable Wiring. *Id.* at 70

Even if this speculative testimony were admissible, *see Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 175–76 (5th Cir.1990) (admissibility of evidence on summary judgment is subject to the same rules that govern admissibility of evidence at trial), it represents the full extent of proof presented by Mr. Santelices on CWI's purported oversight activities. Mr. Santelices has not provided any evidence as to what CWI did when it purportedly checked the work. There is no evidence that CWI checked the work on a daily basis, gave work commands or otherwise intervened in the performance of the installers' duties, on a daily basis or anytime. Thus, even taken in the light most favorable to Mr. Santelices, evidence of this type of minimal oversight is more akin to that found in *Aimable*, 20 F.3d at 441, where no dual employment was found, than that in *Antenor*, 88 F.3d at 933–38.

■ Mr. Santelices also relies on language from the CWI–SFCC Agreement to demonstrate CWI's control over SFCC's hiring decisions. For example, the Agreement provides that CWI would, at SFCC's written request and expense, assist with payroll. *See* CWI–SFCC Agreement ¶ 9. The Agreement also requires SFCC's employees to be neatly dressed and polite. *See id.* ¶ 10. Assuming CWI retained the right to such control, however, these technical contractual concepts alone do not sat-

isfy the "economic realities" test required as the test of employment. *See, e.g., Goldberg*, 366 U.S. at 33, 81 S.Ct. 933 (citing *Silk*, 331 U.S. at 713, 67 S.Ct. 1463; *Rutherford Food Corp.*, 331 U.S. at 729, 67 S.Ct. 1473).

As for Mr. Santelices' allegation that CWI assisted SFCC prepare its payroll and contributed to the wages it paid, Mr. Santelices again, has not presented any evidence to substantiate this claim. Although CWI may have offered, at SFCC's written request, direction and expense, to assist SFCC by providing its payroll services, *see* CWI–SFCC Agreement ¶ 9, Mr. Santelices has not shown that CWI actually undertook to provide these services or was otherwise involved in the actual preparation of payroll and wages. As for Mr. Santelices' assertion that CWI determined the manner of payment to SFCC to be piece-rate, without any factual proof, I fail to see how CWI's manner of payment to SFCC controlled SFCC's method of compensation to him.

Examination of the foregoing factors in light of the totality of the evidence presented, demonstrates that Mr. Santelices may have been dependent upon SFCC during the alleged period of employment. I cannot conclude, however, that Mr. Santelices was economically dependent upon CWI. Accordingly, CWI's motion for summary judgment [D.E. 57] is GRANTED.

## V. MR. SANTELICES' PROOF OF OVERTIME HOURS WORKED

Assuming that Mr. Santelices was SFCC's employee, Mr. Santelices must satisfy his burden of proof by sufficiently demonstrating that he is entitled to overtime compensation. Under Federal Rule of Civil Procedure 56(c), Mr. Santelices, as the non-movant, has the burden at summary judgment "to come forward with specific facts on each essential element of his

claims showing that there is a genuine issue for trial such that a reasonable jury could find in his favor." *Matsushita Electric Indus. Co.,* 475 U.S. at 586–87, 106 S.Ct. 1348. As previously noted, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position" is insufficient; "there must be evidence on which the jury could reasonably find for the plaintiff." *Liberty Lobby, Inc.,* 477 U.S. at 252, 106 S.Ct. 2505. It is not the function of the court, however, to decide issues of material fact, and the court must avoid weighing conflicting evidence and making credibility determinations. *See id.* at 249, 255, 106 S.Ct. 2505.

■ It is also well-established that an employee who brings suit under § 16(b) of the FLSA for unpaid minimum wages or unpaid overtime compensation and liquidated damages has the initial burden of proving that he performed work for which he was improperly compensated. *See Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687–88, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946), *superseded by statute on other grounds as stated in Carter v. Panama Canal Co.,* 463 F.2d 1289, 1293 (D.C.Cir. 1972). In *Mt. Clemens,* the Supreme Court established a shifting burden of proof applicable when the employee is unable to secure accurate records showing the precise extent of uncompensated work. The Supreme Court held that the employee has carried out his burden of proof

> if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the em-

ployee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

328 U.S. at 687–88, 66 S.Ct. 1187. In establishing this shifting burden of proof, the Supreme Court also stated that

> **here we are assuming that the employee has proved that he has performed work and has not been paid in accordance with the statute.** The damage is therefore certain. The uncertainty lies only in the amount of damages arising from the statutory violation by the employer ... It is enough under these circumstances if there is a reasonable inference as to the extent of the damages.

*Id.* at 688, 66 S.Ct. 1187 (emphasis added). Thus, although the Supreme Court established a standard for awarding damages when the evidence of damages is inexact or imprecise, it did not eliminate the employee's burden to prove that he has in fact performed work for which he was not paid.

■ Although Mr. Santelices is unable to demonstrate the exact amount of hours for which he was uncompensated, this does not defeat his claim at this stage. His testimony was that he worked more than forty hours, and it is the duty of the factfinder to draw all reasonable and just inferences in his favor. *See, e.g., Brock v. Seto,* 790 F.2d 1446, 1448 (9th Cir.1986) (reversing the district court's finding that the plaintiffs' evidence of damages was too speculative and stating that "*Mt. Clemens Pottery* leaves no doubt that an award of back wages will not be barred for imprecision where it arises from the employer's failure to keep records as required by the FLSA"). Mr. Santelices makes the following argument based on his deposition testimony to support his burden of proof under *Mt. Clemens:*

Santelices testified that he worked "on an average basis, it was more than forty [hours]." Santelices, p. 157:6–8, 159:3–8. He was required to and did arrive at work by 6:30 a.m. *Id.*, pp. 112:16–19; 153:19–21. He took about fifteen (15) minutes for lunch. *Id.*, p. 233:20–23. He would drive home, spend 20 minutes or so changing and then watched Jeopardy. *Id.*, p. 230:8–20. Jeopardy began at 7:30 p.m. *Id.*, 8–20. "[E]very day I was getting home after five." *Id.*, p. 159:6–7. He worked six (6) days a week. *Id.*, p. 153:6–7.

Plaintiff's Response at 16 [D.E. 70] (Feb. 10, 2000). Based upon this testimony, Mr. Santelices contends that he has sufficiently demonstrated that he worked "10 (or more) hours per day, 6 days per week." *Id.* A reasonable jury hearing this testimony could conclude that Mr. Santelices worked overtime hours for which he was not compensated. Therefore, a material issue of fact exists as to whether Mr. Santelices has proven that he worked overtime hours for which he was not compensated.

In sum, I am unable to say that as a matter of law Mr. Santelices is not entitled to present this evidence to a finder of fact so that reasonable inferences may be drawn. Instead, the burden of imprecision must fall on the employer, whose legal obligation it was to keep accurate records, and no such records have been provided. *See Mt. Clemens*, 328 U.S. at 688, 66 S.Ct. 1187 ("In such a case 'it would be a perversion of the fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts.'") (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931)).

## VI. CONCLUSION

Based on the foregoing analysis, and having considered the evidence presented in the light most favorable to Mr. Santelices, I find that Mr. Santelices has failed to present sufficient evidence to defeat CWI's motion for summary judgment, and the motion [D.E. 57] is therefore GRANTED. Material issues of fact exist, however, with regard to the nature and extent of control SFCC exerted over Mr. Santelices while he performed cable installation during the alleged period of employment and regarding the hours for which Mr. Santelices has not been compensated. Accordingly, SFCC's motion for summary judgment [D.E. 60] is DENIED.