[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-12614

_____

D. C. Docket No. 8:09-cv-01985-EAK-TBM

MICHAEL SCANTLAND,
DANIEL LAWRENCE,
individually, and on behalf of all
others similarly situated, et al.,

Plaintiffs - Appellants,

versus

JEFFRY KNIGHT, INC.,
d.b.a. Knight Enterprises,
JEFFRY D. KNIGHT,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(July 16, 2013)

Before CARNES, HULL and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge:

The plaintiffs in this conditionally certified collective action are current and former technicians who installed and repaired cable, internet, and digital phone services for defendant Jeffry Knight, Inc. ("Knight"), an installation and repair service contractor for the cable company Bright House Networks ("BHN") in Florida.  Plaintiffs appeal the district court's order on summary judgment holding that they were "independent contractors"—not "employees"—and therefore not entitled to overtime and minimum wage protections afforded by the Fair Labor Standards Act ("FLSA" or "Act"), 29 U.S.C. § 201 et seq.  After careful review of the record, and with the benefit of oral argument, we conclude that the district court erred in this determination.

## I.    STANDARD OF REVIEW

This Court reviews an appeal from a summary judgment de novo and applies the same legal standards that control the district court.  RJR Nabisco, Inc. v. United States, 955 F.2d 1457, 1459 (11th Cir. 1992).  Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The court must view all evidence most favorably toward the nonmoving party, and all justifiable inferences are to be drawn in the nonmoving party's favor."  Hoffman v. Allied Corp., 912 F.2d 1379, 1383 (11th Cir. 1990).

2

A determination of employment status under the FLSA is a question of law reviewed de novo. Antenor v. D & S Farms, 88 F.3d 925, 929 (11th Cir. 1996). The underlying facts and reasonable inferences therefrom are viewed in the light most favorable to plaintiffs, the non-moving party. Id.

## II.    THE FLSA

Congress passed the FLSA "to lessen, so far as seemed then practicable, the distribution in commerce of goods produced under subnormal labor conditions." Rutherford Food Corp. v. McComb, 331 U.S. 722, 727, 67 S. Ct. 1473, 1475 (1947). The FLSA's overtime and minimum wage protections were the "method chosen to free commerce from the interferences arising from production of goods under conditions that were detrimental to the health and well-being of workers." Id. These protections, however, extend only to "employees," a term given rough outline by a series of broad definitions in the Act. 29 U.S.C. §§ 206, 207. An "employee" is "any individual employed by an employer." Id. § 203(e)(1). An "employer" "includes any person acting directly or indirectly in the interest of an employer in relation to an employee." Id. § 203(d). The term "employ" "includes to suffer or permit to work." Id. § 203(g).

These definitions are intended to be "comprehensive enough" to include "working relationships, which prior to this Act, were not deemed to fall within an employer-employee category." Rutherford Food, 331 U.S. at 729, 67 S. Ct. at

3

1476 (quoting Walling v. Portland Terminal Co., 330 U.S. 148, 150-51, 67 S. Ct. 639, 640 (1947)).  These "broad" definitions do not, however, bring "independent contractors" within the FLSA's ambit.  See id. at 728-29, 67 S. Ct. at 1476.

To determine whether an individual falls into the category of covered "employee" or exempted "independent contractor," courts look to the "economic reality" of the relationship between the alleged employee and alleged employer and whether that relationship demonstrates dependence.  See Bartels v. Birmingham, 332 U.S. 126, 130, 67 S. Ct. 1547, 1550 (1947) ("[E]mployees are those who as a matter of economic reality are dependent upon the business to which they render service."); Goldberg v. Whitaker House Coop., Inc., 366 U.S. 28, 33, 81 S. Ct. 933, 936 (1961) (referencing "'economic reality' rather than 'technical concepts'" as the "test of employment"); Aimable v. Long & Scott Farms, Inc., 20 F.3d 434, 439 (11th Cir. 1994) ("To determine whether an employer/employee relationship exists for purposes of federal welfare legislation, we look . . . to the 'economic reality' of all the circumstances concerning whether the putative employee is economically dependent upon the alleged employer.").  This inquiry is not governed by the "label" put on the relationship by the parties or the contract controlling that relationship, but rather focuses on whether "the work done, in its essence, follows the usual path of an employee."  Rutherford Food, 331 U.S. at 729, 67 S. Ct. at 1476.  "[P]utting on an 'independent contractor' label does not take the worker

4

from the protection of the Act."  Id.; see also Usery v. Pilgrim Equip. Co., 527 F.2d 1308, 1312 (5th Cir. 1976) ("It is not significant how one 'could have' acted under the contract terms.  The controlling economic realities are reflected by the way one actually acts.").[1]

Courts have applied various multifactor tests to guide the "economic reality" inquiry.  Both parties in the instant appeal rely on the following six factors, which many courts have used as guides in applying the economic reality test:

(1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;
(2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;
(3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers;
(4) whether the service rendered requires a special skill;
(5) the degree of permanency and duration of the working relationship;
(6) the extent to which the service rendered is an integral part of the alleged employer's business.[2]

---

[1]     The Eleventh Circuit has adopted, as binding precedent, all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.  Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

[2]     The first five factors derive from Usery, the sixth from Rutherford Food.  As the U.S. District Court for the Southern District of Florida explained in another case examining the employee-independent contractor issue in the context of the cable installation industry:

No one factor is controlling, nor is the list exhaustive.  The factors simply summarize the matters deemed relevant by the Supreme Court in Bartels v. Birmingham, 332 U.S. 126, 130, 67 S. Ct. 1547, 91 L. Ed. 1947 (1947), United States v. Silk, 331 U.S. 704, 716, 67 S. Ct. 1463, 91 L. Ed. 1757 (1947), and Rutherford Food, 331 U.S. at 729, 67 S. Ct 1473, to help gauge the degree of dependence of an alleged employee on the business with which they are connected.  The weight of each factor depends on the light it sheds on the putative employee's dependence on the alleged employer, which in turn depends on the facts of the case.  See Antenor, 88 F.3d at 933.

While these factors serve as guides, the overarching focus of the inquiry is economic dependence:

> No one of these considerations can become the final determinant, nor can the collective answers to all of the inquiries produce a resolution which submerges consideration of the dominant factor—economic dependence. The . . . tests are aids—tools to be used to gauge the degree of dependence of alleged employees on the business with which they are connected. It is <u>dependence</u> that indicates employee status. Each test must be applied with that ultimate notion in mind. More importantly, the final and determinative question must be whether the total of the testing establishes the personnel are so dependent upon the business with which they are connected that they come within the protection of FLSA or are sufficiently independent to lie outside its ambit.

<u>Usery</u>, 527 F.2d at 1311-12 (emphasis in original) (citations omitted). Ultimately, in considering economic dependence, the court focuses on whether an individual is "in business for himself" or is "dependent upon finding employment in the business of others." <u>Mednick v. Albert Enters., Inc.</u>, 508 F.2d 297, 301-02 (5th Cir. 1975).[3]

## III. DISCUSSION

Because both parties apply the six-factor test set out above, and because we agree that those factors are relevant to determining whether an individual is an employee or independent contractor, we apply them here. We note, however, that

---

<u>Santelices v. Cable Wiring</u>, 147 F. Supp. 2d 1313, 1319 (S.D. Fla. 2001).

[3] See <u>Bonner</u>, 661 F.2d at 1209.

these six factors are not exclusive and no single factor is dominant.  We view the subsidiary facts relevant to each factor through the lens of "economic dependence" and whether they are more analogous to the "usual path" of an employee or an independent contractor.  And of course, in the summary judgment posture of this case, we take reasonable inferences in favor of the plaintiffs in determining the facts underlying each factor in the analysis.

A. Control

The first factor considers the nature and degree of the alleged employer's control as to the manner in which the work is to be performed.  "Control is only significant when it shows an individual exerts such a control over a meaningful part of the business that she stands as a separate economic entity."  Usery, 527 F.2d at 1312-13.  The facts, viewed in the light most favorable to plaintiffs, indicate that Knight exercised significant control over plaintiffs such that they did not stand as "separate economic entities" who were "in business for themselves."

Technicians were required to report to a Knight facility by 7:00 to 7:15 each morning.  Technicians would turn in equipment from the previous day and submit their work orders, which included the billing codes that determined their pay for particular jobs.  These billing codes were set by Knight, and managers could unilaterally change the codes that technicians reported, thereby reducing a

technician's pay.[4]  Plaintiffs would also receive a "route" detailing the current day's work orders, which were generally assigned in two-hour timeslots.  Though plaintiffs' "Independent Contractor Service Agreements" provided that they could "decline any work assignments," plaintiffs testified that they could not reject a route or a work order within their route without threat of termination or being refused work in the following days.  Thus, while a technician might consider a specific route or work order unprofitable, because, for example, it was low-paying or far away, plaintiffs had no power to decline the assignment.[5]  Technicians also

---

[4]    BHN provided Knight billing codes that determined what Knight was paid for completing a particular job.  Knight then adjusted those billing codes for use by technicians to determine what a technician would be paid for completing a particular job.  This resulted in a 60/40, 55/45, or 50/50 split of the proceeds of a job, with the unequal splits favoring Knight.

[5]    Certain jobs are more profitable because of the billing codes assigned to them, how far away they are (and thus how much gas must be used to reach them), or how quick or easy they are to complete.  For example, apartments might be easier than houses because they are wired for easy cable hook-ups.  Thus, even though a job at an apartment complex could take significantly less time than the same job at a house, technicians would be paid the same amount for both jobs.

The issue of whether technicians were able to choose preferred work orders and areas or reject unwanted ones is strongly contested by the parties.  Plaintiffs' testimony indicates that some technicians were able to select particular areas or work orders.  Plaintiff Scantland testified in his deposition that, as a "lead" technician, he let his best technicians cherry pick the work orders they wanted from others' routes.  Plaintiff Zapata's deposition testimony confirmed this practice.  He testified that his route was often cherry picked by the time he arrived at work.  Plaintiffs Zapata and Hauser testified that their geographic preferences were usually granted.

On the other hand, plaintiffs' testimony clearly asserts that they were not free to decline particular work orders, as claimed by Knight.  Plaintiffs Zapata and Sperry testified that when they tried to decline unpleasant jobs, they were threatened with being terminated or not receiving work the next day.  Plaintiff Downs testified that it was known that if a technician turned down a route he could be given a difficult, low-paying job, such as digging to lay lines, or no work at all the following day.  Plaintiff Hauser testified that he had been denied work for a couple of days

might be required to attend quality control meetings and classes on new equipment or participate in a monthly equipment inventory conducted by BHN, which required technicians to unload their trucks and account for all BHN equipment. This morning routine could last up to two hours. Plaintiff Sperry testified that he had to arrive by 5:30 a.m. in order to make it to his first job assignment on time.

During occasional downtime, technicians could request additional jobs; they could also be required to assist other technicians or be assigned additional jobs that they could not refuse. Technicians might be required to stay on the job until all the technicians in their area had completed their work; they could also be called back to jobs long after completing them to address problems.

Plaintiffs could "upsell" by convincing customers to add additional BHN services, but those orders had to be approved by Knight. Plaintiffs could not sell non-BHN services to customers and could not work for other companies, either because they were told they could not do so or because the schedule Knight imposed prevented them from doing so. Plaintiffs could, according to their contract, employ others to help them, but any such "employees" had to be

---

after he refused an additional assignment toward the end of his workday. Hauser also testified that his preferred area was taken away from him after he declined a particular assignment.

Technicians could transfer work orders among themselves and pair up to complete their work; when they did so, they determined among themselves how to divide their pay.

9

technicians already engaged by Knight, and were therefore bound by Knight's policies.

Plaintiffs were subject to meaningful supervision and monitoring by Knight. Technicians routinely communicated with dispatch during the day and were required to log in and out of Work Force Management—a service on their cellular phones that they paid for via payroll deductions—to indicate when they arrived on a job, when they completed a job, and what their estimated time of arrival was for their next job.[6]

Knight or BHN also conducted site checks of technicians' work, and Knight tracked technicians' "quality control discrepancy rate." Technicians with consistent quality control issues could be given "remedial training" at a "mock house" or they could be terminated. An installation manager also might counsel a technician regarding his physical appearance or the appearance of his vehicle.

Knight levied uncontestable fines called "chargebacks" for not meeting specifications, not using Work Force correctly, misplacing inventory, or being late to a job. Typically, $100 would be deducted from the technician's pay for chargebacks on residential jobs and $150 for commercial jobs. Plaintiff Downs

---

[6]    It does not appear, however, that Work Force Management would provide an accurate picture of all technicians' schedules. Plaintiff Downs testified that his supervisor told him to log in and out of Work Force according to time slots, not actual arrival times, so that it would appear that they were on schedule. Plaintiff Hauser testified that he would postpone logging out of Work Force when he completed a job in order to avoid being assigned more work.

testified that chargebacks could mount up to the point where they surpassed the amount of money a technician could earn on a job.

Technicians could also be "downloaded," i.e., fired, for consistently misbilling, fraudulently billing, stealing, having a bad attitude, having consistently low quality control ratings, and being rude to customers, other technicians, or Knight employees. Knight's Jill Williams testified that she and another installation manager had downloaded more than one hundred technicians.

Plaintiff technicians worked five to seven days a week; some were required to work six days a week and sometimes seven days a week because of a requirement that they work rotating Sundays. Plaintiffs regularly worked more than forty hours a week.[7] Technicians either had to inform their supervisors that they would be taking time off or request time off in advance, sometimes in writing.

In sum, Knight controlled what jobs plaintiffs did, how much they were paid, how many hours they worked, how many days they worked, their daily work schedule, whether they could work for others, whether they could earn additional income from customers, and closely monitored the quality of their work. Plaintiffs could not bid for jobs or negotiate the prices for jobs. Their ability to hire and

---

[7] For example, Plaintiff Sperry testified that he usually worked sixty to seventy-five hours a week and sometimes as many as eighty hours a week. Plaintiff Zapata testified that he usually worked fifty to sixty hours a week and sometimes up to seventy-five to eighty hours. Plaintiff Downs testified that he frequently worked seventy-hour weeks.

manage others was illusory.  This alleged control strongly suggests that the plaintiffs were economically dependent upon Knight.

Knight vigorously disputes many of the facts relied upon by plaintiffs.  We are, however, bound at this stage of the litigation to view the facts in the light most favorable to plaintiffs.  Knight also disputes that particular alleged facts indicate that it controlled plaintiffs.  For example, Knight claims that the specifications technicians were required to follow and the periodic communication they had to maintain with Knight were consistent with duties required of independent contractors.[8]  We agree that meeting clients' specifications and keeping clients informed of job progress is consistent with the "usual path" of an independent contractor.  But the specific facts alleged by plaintiffs diverge from the "usual path."  Plaintiffs testified that the manner of their work was tightly regulated by Knight and left them with no discretion in how to approach a particular job.[9]

---

[8]    See Herman v. Mid-Atlantic Installation Servs., Inc., 164 F. Supp. 2d 667, 672-73 (D. Md. 2000), aff'd sub nom. Chao v. Mid-Atlantic Installation Servs., Inc., 16 F. App'x 104 (4th Cir. 2001) ("It is in the nature of a contract that the contractor promises to deliver the performance bargained for by the client.  For example, a builder will build a building according to the specifications of an architect.  That does not make the builder an employee.  A painter will paint a house the colors dictated by the homeowner.  That does not make the painter an employee.  In short, requiring a contractor to meet the client's technical specifications is not the type of 'control' which bestows 'employee' status on the contractor.").

[9]    See Lang v. DirectTV, Inc., 801 F. Supp. 2d 532, 537-38 (E.D. La. 2011) (concluding that a material issue of fact existed regarding whether satellite company's instructions to installation technicians "went beyond providing mere technical specifications"). We also note that Knight was able to control the manner in which technicians performed their work via its training regimens.  As will be discussed below, most technicians were inexperienced in the trade and were trained by Knight on how to meet detailed specifications.

Furthermore, the communication that plaintiffs assert they were required to maintain with Knight was constant, not periodic. Knight also argues that its quality control measures cannot be "the single fact that … convert[s] an otherwise independent relationship into one of employment." It is not. Here, Knight's quality control measures are just one of numerous indicia of control that together strongly suggest an employee-employer relationship.

Knight further argues that the chargebacks it levied against technicians were consistent with a contractual relationship in which money would be withheld when work was not done correctly. Knight relies on Herman v. Mid-Atlantic Installation Services, Inc., where the district court determined that chargebacks were akin to "punch lists" in construction contracts where "a certain percentage is generally withheld from each payment pending complete performance of the contract." 164 F. Supp. 2d 667, 673 (D. Md. 2000), aff'd sub nom. Chao v. Mid-Atlantic Installation Servs., Inc., 16 F. App'x 104 (4th Cir. 2001). We view the chargebacks differently. Such fines can also be levied against employees for shortages caused by loss or breakage. Furthermore, when an independent contractor fails to follow specifications, the usual penalty is the actual cost of damages, whereas here the chargebacks were flat charges that could exceed the actual value of the job at issue. Thus, the chargebacks here seem more consistent

13

with disciplining employees. Though the chargebacks do not strongly indicate employee status, they also do not support a finding of independent contractor status.[10]

Knight also argues that its quality control measures and regulation of schedules stemmed from "the nature of the business" and are therefore not the type of control that is relevant to the economic dependence inquiry. We disagree. The economic reality inquiry requires us to examine the nature and degree of the alleged employer's control, not why the alleged employer exercised such control. Business needs cannot immunize employers from the FLSA's requirements. If the nature of a business requires a company to exert control over workers to the extent that Knight has allegedly done, then that company must hire employees, not independent contractors.

Finally, Knight points this Court to unpublished opinions finding that an installation contractor such as Knight did not exercise control over technicians. We find those non-binding decisions unpersuasive in light of the specific facts of this case. The facts of this case more closely resemble cases in which courts have found installation technicians to be employees.[11]

---

[10]    We also note that the record indicates that technicians already had to provide Knight with a separate warranty retainer that, per the parties' contract, ensured that technicians' work would be free from defects for a set period.

[11]    For example, in Santelices, the district court denied a cable installation contractor's motion for summary judgment because of the existence of a material issue of fact

14

Assuming factual inferences in favor of plaintiffs, this factor points strongly toward "employee" status.

B.  Opportunity for Profit or Loss

The second factor considers the alleged employee's opportunity for profit or loss depending upon his managerial skill.  The facts, taken in the light most favorable to plaintiffs, indicate that plaintiffs' opportunity for profit or loss depended more upon Knight's provision of work orders and technicians' own technical skill and efficiency than their managerial skill.

Plaintiffs' opportunity for profit was largely limited to their ability to complete more jobs than assigned, which is analogous to an employee's ability to take on overtime work or an efficient piece-rate worker's ability to produce more pieces.  An individual's ability to earn more by being more technically proficient is unrelated to an individual's ability to earn or lose profit via his managerial skill, and it does not indicate that he operates his own business.  As the Supreme Court has explained, a job whose profits are based on efficiency is "more like piecework than an enterprise that actually depend[s] for success upon the initiative, judgment

with regard to the control factor.  Santelices, 147 F. Supp. 2d at 1319.  The district court cited several "specific indicia of control" relevant here: the technician was required to report to a warehouse at a specific time each morning, he could not turn down work, he had to adhere to specific timeframes, he had to "maintain periodic communication with the company" via a two-way radio that was paid for via paycheck deductions, his ability to earn extra money was limited because scheduled work took precedence and any additional work had to be approved, he did not have the ability to negotiate the prices charged for his services, and he was "not at liberty to hire his own helpers."  Id. at 1321-23.

15

or foresight of the typical independent contractor." Rutherford Food, 331 U.S. at 730, 67 S. Ct. at 1477.

Technicians could not negotiate or otherwise determine the rates they were paid for jobs. In fact, the billing codes they submitted were subject to unilateral change by Knight. They were also subjected to uncontestable chargebacks that could wipe out their earnings from a single job.[12] Knight's argument that plaintiffs could control losses by avoiding chargebacks is unpersuasive. Chargebacks relate to the quality of a technician's skill, not his managerial or entrepreneurial prowess.

Plaintiffs' ability to earn additional income through their own initiative was limited. Though plaintiffs could "upsell," any jobs added to a work order by a technician had to be approved by Knight, and plaintiffs testified that the extra income was minimal and often not worth the additional effort. Plaintiffs could not sell non-BHN services to customers, nor work for other companies because of either a flat prohibition or because the schedules demanded by Knight prevented them from pursuing other work.

Plaintiffs were able to exert some control over their opportunity for profits by pairing up to complete jobs and trading jobs among each other, but this ability was ultimately limited by the number and types of jobs Knight assigned them and

---

[12]    See Lang, 801 F. Supp. 2d at 539 ("Plaintiffs' ability to influence their profits and losses is also impacted by the extent to which defendants could deduct fees from plaintiffs' pay. This is particularly true if the defendants deducted fees in excess of the value of the jobs performed, and plaintiffs had no means of recourse to dispute the deductions.").

16

whether Knight's assigned schedule permitted them time to do so. Furthermore, as previously discussed, though the parties' contract provided that technicians could hire helpers, this authority was illusory. Any helpers were required to be contracted with Knight as technicians, thus precluding the exercise of any real managerial skill over such helpers.

Assuming factual inferences in favor of plaintiffs, and in light of the minimal opportunity for profit (and that being little different from the usual path of an employee), this factor suggests economic dependence, and points strongly toward employee status.

C. Investment in Equipment or Materials

The third factor considers the alleged employee's investment in equipment or materials required for his task, or his employment of workers. This factor favors independent contractor status, although it does so only weakly.

As previously discussed, technicians' ability to employ workers was illusory. As regards investment in equipment and materials, Knight provides, via BHN, the hardware that is actually installed in customers' homes and businesses, such as cable boxes, DVRs, and cable modems. Technicians are required to have vehicles, auto insurance, tools and safety equipment, and commercial general liability insurance. However, in light of the fact that most technicians will already own a vehicle suitable for the work and that many technicians purchased specialty

17

tools from Knight directly via payroll withholdings, there seems to be little need for significant independent capital and very little difference from an employee's wages being increased in order to pay for tools and equipment. Furthermore, even though a technician who initially bought his tools from Knight and paid for them via withholdings has some economic independence when the tools are paid for, it is analogous to the independence any employee has who has gained experience and the ability to market himself to competing employers.

In sum, these expenditures seem to detract little from the worker's economic dependence on Knight, which is the lens through which we evaluate each of the several factors. Thus, to the extent that this factor weighs in favor of independent contractor status, the weight in that direction is minimal.

D.  Special Skill

The fourth factor considers whether the service rendered requires a special skill. This factor favors independent contractor status, but it does so only weakly.

Plaintiffs were clearly skilled workers.[13] The meaningfulness of this skill as indicating that plaintiffs were in business for themselves or economically independent, however, is undermined by the fact that Knight provided most technicians with their skills. Technicians could come to Knight from other

---

[13]    Plaintiffs conceded as much in their Second Amended Complaint. See Doc. 38 at 1 ("Plaintiffs are skilled technicians who install and repair high-speed Internet, cable television and telephone services for customers of Defendant Bright House, LLC.").

installation outfits or be completely inexperienced.  Most technicians, however, were inexperienced and underwent some length of unpaid training by Knight, which was followed by some period of unpaid ride-alongs with experienced technicians, before performing work on their own.  Robert Collins, a former Knight installation manager, testified that Knight generally provided about two weeks of training and technicians did about a week of ride-alongs, and he estimated that only 10 to 15 percent of technicians did not require training.

Plaintiffs were, therefore, dependent upon Knight to equip them with the skills necessary to do their jobs.  The skills attained by technicians point toward a degree of economic independence insofar as a highly trained technician could gain economic independence by the ability to market his skills to a competing employer.  This does not, however, significantly distinguish such a worker from the "usual path of an employee."  To the extent that this factor favors independent contractor status, it does so weakly.

### E.  Permanency and Duration

The fifth factor considers the degree of permanency and duration of the working relationship.  This factor points strongly toward employee status.

Named plaintiffs worked for Knight for an average of more than five years.  Their contracts were for year terms, were automatically renewed, and were

19

terminable only with thirty days' notice.  These facts suggest substantial permanence of relationship.

Knight argues that this factor must also be viewed in terms of exclusivity, arguing that a technician's ability to work for other installation contractors is significant.  Exclusivity is relevant.  However, the facts viewed in the light most favorable to plaintiffs favor plaintiffs in this regard.  Plaintiffs' evidence indicates that they could not work for other companies, were required to work long hours, and could not turn down work orders.  Thus, their relationship with Knight was not only of long duration, but it was also exclusive.

Assuming factual inferences in favor of plaintiffs, and looking through the lens of economic dependence vel non, long tenure, along with control, and lack of opportunity for profit, point strongly toward economic dependence.  Thus, this factor strongly indicates employee status.

F.  Integral Part of Alleged Employer's Business

The sixth and final factor considers the extent to which the service rendered is an integral part of the alleged employer's business.  This factor weighs clearly and strongly toward employee status.

Approximately two-thirds of Knight's business consists of the telecommunications installation and repair services it performs for BHN.  Knight relies on approximately five hundred technicians to perform installations and

20

repairs in BHN customers' homes and businesses.  Knight's website described its Installation Services department as the "backbone" of its business.

The integral role played by technicians in Knight's business shows that the arrangement follows more closely that of an employer-employee relationship than an independent contractor dynamic.  If Knight had truly outsourced such a large portion of its business, as would be true if plaintiffs were independent contractors, then the company would retain far less control over the business.  However, because of Knight's concern with the quality of the services it provides through this arrangement, it does, as one might expect, control the relationship in much the same way a company would control its employees.  The technicians' integral part in Knight's business follows the "usual path of an employee."

Assuming factual inferences in favor of plaintiffs, this factor points strongly toward employee status.

### G.  Weighing the Factors

When all the facts are viewed in the light most favorable to the plaintiffs and all reasonable inferences are drawn in their favor, four of the six factors weigh strongly in favor of employee status.  The two factors that do not—investment and special skill—weigh only very slightly toward independent contractor status.  Neither contributes in any significant manner to the workers' economic independence or to distinguishing the workers from "the usual path of an

21

employee." Thus, we conclude that, viewing the facts most favorably toward plaintiffs and with all justifiable inferences drawn in their favor, plaintiffs were "employees"—not "independent contractors"—under the FLSA. Because there are genuine issues of material fact, and because plaintiffs were "employees" if all reasonable factual inferences are found in plaintiffs' favor, the district court erred in granting summary judgment to Knight.

## IV.    MOTIONS REGARDING KNIGHT'S ALLEGED COERCIVE AND RETALIATORY CONDUCT

Plaintiffs argue that the district court abused its discretion in failing to limit Knight's allegedly coercive and retaliatory course of conduct against plaintiffs and potential opt-in plaintiffs and that the district court took no action in response to its repeated efforts to bring this alleged conduct to its attention via various motions.

This is not the case. On March 16, 2012, the district court denied the plaintiffs' motions to reopen the opt-in period, for protective order, for corrective notice, and for sanctions. The court noted that a pretrial conference had been scheduled, trial was set to begin in June, discovery was over, "dispositive motions [had] been taken under advisement," and reopening the opt-in period "would serve no purpose." The district court also explained that any "additional claims of retaliation . . . can be pursued in a separate case."

22

We review a district court's decision made in the course of managing its docket for an abuse of discretion.  See Young v. City of Palm Bay, Fla., 358 F.3d 859, 863-64 (11th Cir. 2004).  Plaintiffs do not challenge the district court's rationale in this regard.  We therefore conclude that the district court did not abuse its wide discretion in managing its docket.

## V.    CONCLUSION

The district court's denial of plaintiffs' motions to reopen the opt-in period, for protective order, for corrective notice, and for sanctions is AFFIRMED.  The district court's summary judgment order is REVERSED and REMANDED for further proceedings consistent with this opinion.[14]

---

[14]    Knight's motion to strike plaintiffs' notice of supplemental authority is DENIED AS MOOT.  Other challenges to the judgments of the district court are rejected without need for further discussion.