[Cite as *State ex rel. Ugicom Ents., Inc. v. Morrison, Admr., Bur. of Workers' Comp.*, 2021-Ohio-1269.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State ex rel. Ugicom Enterprises, Inc.,     :

        Relator,                         :

v.                                        :                No. 17AP-895

Sarah Morrison, Administrator,          :            (REGULAR CALENDAR)
Bureau of Workers' Compensation,

                                     :

        Respondent.                  

                                       :

D E C I S I O N

Rendered on April 13, 2021

**On brief:** *Zashin & Rich Co., LPA, and Scott Coghlan, for relator.* **Argued:** *Scott Coghlan.*

**On brief:** *Dave Yost,* Attorney General, and *Jacquelyn McTigue*, for respondent. **Argued:** *Jacquelyn McTigue.*

IN MANDAMUS
ON OBJECTIONS TO THE MAGISTRATE'S DECISION

MENTEL, J.

{¶ 1} Relator, Ugicom Enterprises, Inc., filed an original action requesting this court issue a writ of mandamus against respondent, Administrator, Ohio Bureau of Workers' Compensation, to vacate the administrative determination that certain individuals were employees of relator and issue a new order that those individuals be classified as independent contractors.

{¶ 2} Pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals, this matter was referred to a magistrate who issued the appended decision, including findings of fact and conclusions of law, on September 11, 2020. The magistrate concluded that there was some evidence to support the determination of the adjudicating committee and administrator's designee that the workers at issue were employees rather than independent contractors.

{¶ 3} On September 24, 2020, relator filed timely objections to the magistrate's decision. As such, we must undertake an independent review of the decision to ascertain whether "the magistrate has properly determined the factual issues and appropriately applied the law." Civ.R. 53(D)(4)(d).

{¶ 4} In its first objection, relator contends the magistrate erred by concluding that the administrator's designee did not abuse its discretion in determining that the installers and inspector were employees rather than independent contractors. For the reasons that follow, we disagree.

{¶ 5} The Supreme Court of Ohio has set forth three requirements that must be met to establish a right to a writ of mandamus: (1) relator has a clear legal right to the relief requested, (2) respondent is under a clear legal duty to perform the act requested, and (3) relator has no plain and adequate remedy in the ordinary course of the law. *State ex rel. Denton v. Indus. Comm. of Ohio*, 10th Dist. No. 18AP-100, 2019-Ohio-3173, ¶ 11, citing *State ex rel. Davis v. School Emps. Retirement Sys.*, 10th Dist. No. 08AP-214, 2008-Ohio-4719, ¶ 14. A right to a writ of mandamus exists when a designee's order constitutes an abuse of discretion because it is not supported by any evidence in the administrative record. *State ex rel. Elliot v. Indus. Comm.*, 26 Ohio St.3d 76, 78-79 (1986), citing *State ex rel. Hutton v. Indus. Comm.*, 29 Ohio St.2d 9, 13 (1972); *State ex rel. Teece v. Indus. Comm.*,

68 Ohio St.2d 165, 167 (1981). The term "abuse of discretion" connotes more than an error of law. A reviewing court will only reverse a decision for an abuse of discretion if the decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). Accordingly, this court will not disrupt the prior decision if there is "some evidence" to support it. *State ex rel. Fiber-Lite Corp. v. Indus. Comm.*, 36 Ohio St.3d 202 (1988), syllabus; *State ex rel. Bennett v. Aldi, Inc.*, 10th Dist. No. 14AP-632, 2016-Ohio-83, ¶ 6.

{¶ 6} Pursuant to R.C. 4123.54, a claim for workers' compensation is limited to employees and their dependents. An independent contractor is not an employee for the purposes of workers' compensation and, as a result, an independent contractor is ineligible for workers' compensation benefits. *Bostic v. Connor*, 37 Ohio St.3d 144, 145 (1988). Whether an individual is classified as an employee or an independent contractor is a fact-based determination that turns on whether the individual has a right to control the manner and means of doing the work.[1] *Id.* at 146; *Gillum v. Indus. Comm.*, 141 Ohio St. 373, 374 (1943). " 'If such right [to control the manner and means of doing the work] is in the employer, the relationship is that of employer and employee; but if the manner or means of performing the work is left to one responsible to the employer for the result alone, an independent contractor relationship is created.' " *State ex rel. Nese v. State Teachers Retirement Bd.*, 136 Ohio St.3d 103, 2013-Ohio-1777, ¶ 33, quoting *Pusey v. Bator*, 94 Ohio St.3d 275, 279 (2002), citing *Bobik v. Indus. Comm.*, 146 Ohio St. 187 (1946), paragraph two of the syllabus.

---

[1] This court has previously determined that the common law right to control test should be applied in the instant case, not R.C. 4123.01(A)(1)(c), as this case does not address a construction contract. *State ex rel. Ugicom Ents., Inc. v. Buehrer*, 10th Dist. No. 13AP-527, 2014-Ohio-4942, ¶ 20.

{¶ 7}    The factors to inform this analysis include, but are not limited to, "who controls the details and quality of the work; who controls the hours worked; who selects the materials, tools and personnel used; who selects the routes travelled; the length of employment; the type of business; the method of payment; and any pertinent agreements or contracts." *Bostic* at 146.  As this analysis is fact-intensive, the trier of fact typically decides whether a person is classified as an independent contractor or an employee. *Id.*

{¶ 8}    In the present case, the designee reviewed all the evidence and concluded that relator, on balance, controlled the manner and means of how the installers and inspector performed their work classifying them as employees rather than independent contractors. After a careful review of the record, we agree with the magistrate that there is some evidence to support such a conclusion.[2]

{¶ 9}    The facts indicate relator exerted control over the installers throughout the course of the employer-employee relationship. As examined in more detail by the magistrate, relator contracted with Time Warner Cable ("TWC") to provide installation of cable lines to TWC customers.  TWC paid relator for the services provided and relator would then pay the installers for their labor.  TWC vetted all new hires by relator after the individuals passed a drug screen and background check.  The installers are required to log into their assignment tracker daily to receive work assignments.  Relator would post jobs to approved installers and, once accepted, set a two-hour window for installation.  Relator provided sign-in codes and mandated individuals wear badges. If the badges were misplaced, the installers would pay a fine to TWC.  There was no bidding for jobs or

---

[2] Upon review, we find a scrivener's error at ¶ 81 of the appended magistrate's decision, line 6, where "employees" were inadvertently referred to as "employers."  Accordingly, we modify the magistrate's decision to reflect this change.

negotiations for compensation. Relator pulled government permits on behalf of the installer if the project so required and supplied the installers the vital equipment, such as cable connectors and boxes, to complete the job. Relator also provided larger equipment for more substantial projects. If an issue arose, the TWC dispatcher would say the installer worked for relator. Once a job was complete, the installers were required to update the tracker at the end of the day. Relator would then use a quality control inspector to review the work of installers and would report substandard work for correction. As TWC penalized relator for substandard work or damage to customer property, relator could dock the installer if the problems required remedial work.

{¶ 10} Relator first argues the magistrate failed to cite to any applicable legal authority, outside the right to control test, to support the administrator's determination that the cable installers are employees. We find this argument to be without merit. The magistrate appropriately considered the factors of the right to control test as stated in *Gillum* and *Bostic* and applied the facts accordingly. There is no additional other legal authority and relator cites to none that was required for its analysis.

{¶ 11} Relator next argues that the magistrate incorrectly determined that the installers were of limited skill. We disagree. At the November 4, 2015 hearing, Mary Jo Eyink, the bureau premium auditor who conducted the audit, testified "the skill level needed to bury the cable is not high or unique. A shovel is the primary tool used. A hammer and a bar is used to bury cable under the sidewalk. This is a menial physical labor that requires minimal skill level at its best." (Nov. 4, 2015 Admin. Hearing Tr. at 322-23.) Both the adjudicating committee's findings of fact, which was adopted by the designee, and magistrate's decision reflect the auditor's personal observation that the installers did not demonstrate a high level of skill. While we acknowledge that some federal courts have

concluded, under distinct factual circumstances, cable installers can be considered skilled labor, relator presents no facts to indicate how the auditor, and consequently the magistrate, mischaracterized the level of skill exhibited by the installers in this case.

{¶ 12} Next, relator argues the magistrate disregarded portions of this court's decision in *State ex rel. Ugicom Ents., Inc. v. Buehrer*, 10th Dist. No. 13AP-527, 2014-Ohio-4942 ("*Ugicom I*") by stating installers are paid by "piece work compensation" in contravention of the law of the case doctrine. The doctrine of the law of the case states the decision of a reviewing court remains the law of the case on legal questions involved for subsequent proceedings at both the trial and reviewing levels. *Giancola v. Azem*, 153 Ohio St.3d 594, 2018-Ohio-1694, ¶ 14, citing *Nolan v. Nolan*, 11 Ohio St.3d 1, 3 (1984). "The doctrine is necessary to ensure consistency of results in a case, to avoid endless litigation by settling the issues, and to preserve the structure of superior and inferior courts as designed by the Ohio Constitution." *Hopkins v. Dyer*, 104 Ohio St.3d 461, 2004-Ohio-6769, ¶ 15, citing *Nolan* at 3. The law of the case doctrine is considered to be a rule of practice rather than being a rule of substantive law. *Nolan* at 3.

{¶ 13} In *Ugicom I*, relator requested this court vacate the order of the administrator's designee and to determine that relator's cable installers were independent contractors. We issued a writ holding designee abused its discretion in applying R.C. 4123.01(A)(1)(c) to review whether the installers were employees or independent contractors as that section only applies to construction contracts. We ordered respondent to vacate the existing order and reconsider the facts of the case under the right to control test. We then declined to decide the independent contractor issue because the facts appeared to be in dispute, and we could not apply the right to control test to resolve the employment status of the cable installers as a matter of law. We explained "the

contradictions between the adjudicating committee's conclusions of law and the record evidence make it apparent that certain facts are in dispute. Moreover, because the committee did not make findings of fact in its decision and did not identify evidence to support many of its legal conclusions, we are unable to discern the basis for many of the committee's legal conclusions." *Ugicom I* at ¶ 22. On November 4, 2015, the adjudicating committee held a new hearing that included documentary evidence and live testimony from Fred Kibuuka and auditor Eyink. On January 26, 2016, the adjudicating committee issued a new order reinstating its prior determination that the workers were properly classified as employees. On February 27, 2017, the designee upheld the determination of the adjudicating committee and adopted its facts and legal conclusions in its decision. Because we expressly stated that we could not make a factual determination on whether the installers were independent contractors and noted the record was incomplete, we find the law of the case doctrine inapplicable.

{¶ 14} Upon review of the evidence, we find the magistrate accurately states that relator set a piece-work pay rate for its workers. As stated in the magistrate's decision, piece-rate compensation is often seen as a way to motivate individuals to work more efficiently and is a common indicator of employment as it is regulated by the Fair Labor Standards Act ("FLSA"). While relator argues that the magistrate erred by relying on FLSA case law, we find relator overstates the magistrate's application of these cases. While the magistrate's decision notes that there is useful analysis to be drawn from comparable federal case law under the FLSA, there is no reasonable reading of the analysis that would indicate a deviation from the right to control test as stated in *Gillum* and *Bostic*.

{¶ 15} Moreover, other evidence regarding the installer's compensation indicate an employer-employee relationship. Specifically, installers were not able to bid on various

projects and could lose compensation if the work was deemed deficient. Relator also reserved the right to change the pay rate at any time without notice to the workers. Taking the above evidence into account, the compensation method at issue, on the whole, indicates an employer-employee relationship.

{¶ 16} Relator next contends the magistrate erred by failing to provide "conclusive weight to the independent contractor agreements entered into between Ugicom and the installers." (Relator's Brief at 6-7.) We disagree.

{¶ 17} As an initial matter, an independent contractor agreement, alone, does not provide conclusive weight that an individual is an independent contractor. As stated in *Bostic*, an agreement or contract between the parties is one of several factors in a fact-based determination as to who controls the manner and means of the work. *Bostic* at 146. While an independent contractor agreement is a factor generally considered in favor of an independent contractor relationship, there are aspects of this agreement that also indicate an employee-employer relationship. Most notably, the individuals were bound by a non-compete provision that precluded the installers from working for competitors. The language of this provision had the practical effect of restricting these individuals from outside work. This is most evident from the auditor's review of the inspector's tax return that indicated relator provided the inspector's sole income. This level of exclusivity and ongoing association is representative of an employer-employee relationship.

{¶ 18} While we acknowledge there is evidence on both sides of the question as to whether relator is an employee or independent contractor, this court is not tasked with reviewing the evidence de novo. Rather, our review is limited as to whether there was "some evidence" to support the findings and order of the administrative decision. *State ex rel. Fiber-Lite Corp.*, 36 Ohio St.3d at syllabus; *State ex rel. Bennett*, 2016-Ohio-83, at ¶ 6.

{¶ 19} As such, we overrule relator's first objection.

{¶ 20} In its second objection, relator asserts the magistrate's decision is in direct conflict with this court's decision in *Barcus v. Buehrer*, 10th Dist. No. 14AP-942, 2015-Ohio-3122. For the reasons that follow, we disagree.

{¶ 21} In *Barcus*, the plaintiff was a truck driver that contracted to deliver freight for CEVA Freight, LLC ("CEVA"). The plaintiff owned his truck and paid his own costs associated with the vehicle. Barcus provided his own equipment necessary for the delivery of the freight. Barcus was allowed and, in fact, did employ others to assistant with the work as subcontractors. These individuals were provided a truck and paid directly by Barcus, not CEVA.

{¶ 22} Barcus alleged that he was injured while working for CEVA and sought workers' compensation benefits for his injuries. After Barcus was denied his application by the district hearing officer and staff hearing officer, the Industrial Commission refused his appeal. Pursuant to R.C. 4123.512, Barcus proceeded to file an appeal with the trial court. After answering the complaint, CEVA filed a motion for summary judgment arguing Barcus was an independent contractor and ineligible to receive workers' compensation benefits. The trial court granted CEVA's motion determining that Barcus was an independent contractor, which Barcus appealed. On August 4, 2015, this court affirmed the judgment of the trial court finding that Barcus was an independent contractor at the time of his injury.

{¶ 23} There are a number of factual distinctions between *Barcus* and the present case. First, it is apparent Barcus exercised control over the details and quality of the work. Barcus formed PKG Trucking LLC and hired drivers for a second truck. Barcus paid the drivers and helpers, not CEVA. Here, TWC reviewed all new hires by relator after the individual passed a drug screen and background check. While CEVA also screened Barcus

and his subcontractors, the screening process was required by federal regulations. "Measures taken to comply with federal regulations do not demonstrate the type of employer control necessary to establish an employment relationship." *Id.* at ¶ 29, citing *Testement v. Natl. Hwy. Express*, 114 Ohio App.3d 529, 533 (9th Dist.1996). Regarding the tools to complete the requisite work, Barcus used his own tools and personnel to accomplish the deliveries. Conversely, relator required the installers to use certain equipment, such as cable connectors and cable boxes, and provided larger equipment for more substantial projects. Relator also required the installers to update the company assignment tracker on the status of the project. Once a job was complete, a quality control inspector reviewed whether the work met relator's standards. Though CEVA required Barcus and others to wear uniforms and have a white truck with the company name and logo, this was also mandated by federal regulation. *Barcus* at ¶ 31.

{¶ 24} There are also notable distinctions in the restrictive contractual language employed by the companies in these cases. In *Barcus*, the noncompetition clause only precluded drivers from working for CEVA customers. Barcus was able to haul freight for other carriers as long as he provided notice to CEVA and covered all company identification on the truck. This court stated "this [noncompetition] provision appears motivated by CEVA's desire to protect its business, not to curtail its drivers' ability to engage in outside work." *Id.* at ¶ 30. Here, relator's noncompetition provision had the practical effect of restricting installers from performing outside cable installation work since there were no true competitors. As a result, there was little evidence the workers had separate occupations and businesses apart from relator. This is most apparent in the auditor's review of the inspector's tax return, which indicated relator provided the inspector's sole income. Given these facts, it is clear that while Barcus operated a separate business apart

from CEVA, relator exerted meaningful control over the manner and means of how the installers and inspector performed the work.

{¶ 25} In addition to the important factual differences, the scope of our review in the present case is far more limited. Pursuant to R.C. 4123.512, Barcus brought his case before the trial court to review the denial of his claim for workers' compensation benefits. The case was appealed after the trial court granted CEVA's motion for summary judgment. Our review of a trial court's ruling on a motion for summary judgment is de novo. *Barcus* at ¶ 5, citing *Hudson v. Petrosurance, Inc.*, 127 Ohio St.3d 54, 2010-Ohio-4505, ¶ 29. De novo review requires the reviewing court to conduct an independent analysis without deference to the trial court's decision. *Gabriel v. Ohio State Univ. Med. Ctr.*, 10th Dist. No. 14AP-870, 2015-Ohio-2661, ¶ 12, citing *Byrd v. Arbors E. Subacute & Rehab. Ctr.*, 10th Dist. No. 14AP-232, 2014-Ohio-3935, ¶ 5, citing *Maust v. Bank One Columbus, N.A.*, 83 Ohio App.3d 103, 107 (10th Dist.1992).

{¶ 26} As set forth previously, our review in this case is confined to an abuse of discretion analysis. "A decision is unreasonable if there is no sound reasoning process that would support that decision. It is not enough that the reviewing court, were it deciding the issue *de novo*, would not have found that reasoning process to be persuasive." (Emphasis sic.) *AAAA Ents., Inc. v. Ricer Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990). Regardless of whether we would have reached the same result if considering the matter for the first time, we are limited in our review to determine whether there was some evidence to support the designee's order.

{¶ 27} On review of the magistrate's decision, an independent review of the record, pursuant to Civ.R. 53, and due consideration of relator's objections, we find the magistrate has properly stated the pertinent facts, as modified herein, and applied the appropriate law.

Therefore, we overrule relator's objections to the magistrate's decision and adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein.

{¶ 28} Accordingly, we overrule relator's objections to the magistrate's decision and deny its request for a writ of mandamus.

*Objections overruled*;
*writ of mandamus denied.*

KLATT and BEATTY BLUNT, JJ., concur.

_____

# A P P E N D I X

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State ex rel. Ugicom Enterprises, Inc., | : | |
| Relator, | : | |
| v. | : | No.  17AP-895 |
| Sarah Morrison, Administrator, Bureau of Workers' Compensation, | : | (REGULAR CALENDAR) |
| | : | |
| Respondent. | : | |
| | : | |

## M A G I S T R A T E ' S   D E C I S I O N

Rendered on September 11, 2020

*Zashin & Rich Co., LPA*, and *Scott Coghlan*, for relator.

*Dave Yost,* Attorney General, and *Jacquelyn McTigue,* for respondent.

## IN MANDAMUS

{¶ 29} For the second time, relator, Ugicom Enterprises, Inc. ("Ugicom" or "relator"), brings an original action in this court seeking a writ of mandamus ordering respondent, the Administrator of the Ohio Bureau of Workers' Compensation ("administrator" or "respondent," "BWC" or "the bureau") to vacate an order of the administrator's designee that determines that some individuals are Ugicom employees rather than independent contractors as claimed by Ugicom and to enter an order finding that those persons were not Ugicom employees for the purpose of reporting workers' compensation payroll for the years at issue.

{¶ 30} In the previous action, this court granted a writ of mandamus after determining that respondent should not have applied the test found in R.C. 4123.01(A)(1)(c) to this question and should instead have applied the common-law "right to control" test. *State ex rel. Ugicom Ents., Inc. v. Buehrer*, 1oth Dist. No. 13AP-527, 2014-Ohio-4942 ("*Ugicom I*"). The writ ordered respondent to vacate existing orders in the matter and reconsider it under the correct standard.

{¶ 31} Respondent has now applied the mandated standard and again designated the persons at issue as employees of Ugicom, prompting the present action.

Findings of Fact:

{¶ 32} 1. Ugicom is an Ohio corporation that contracts with Time Warner Cable ("TWC") to provide outside installation of cable lines to TWC customers. The preponderance of the work is for residential customers.

{¶ 33} 2. After issuance of *Ugicom I*, and during the ensuing administrative proceedings in this and related cases, TWC was absorbed by Charter Communications, Inc. and rebranded as Spectrum Communications. The change does not impact discussion of the contested years in this case and this decision will continue to designate TWC as such to maintain consistency with the documentary evidence, administrative record, and prior decisions.

{¶ 34} 3. Michael Kibuuka is the president of Ugicom. He was initially declared as an independent contractor by Ugicom, then became the only employee consistently reported to BWC for the period at issue. Three other persons, including Fred Kibuuka, operations manager, were intermittently classed as employees or contractors.

{¶ 35} 4. To perform cable installations, Ugicom uses installers that it designates as independent contractors. These installers execute a contract, titled "Ugicom Enterprises Independent Contractor Agreement," that sets terms for work allocation, specifications, and compensation. The contract allows the installers to perform other types of installation work outside of the Ugicom jobs if such other work is not on behalf of a TWC competitor.

{¶ 36} 5. Many of the installers choose to operate as sole proprietorships or single-member LLCs, which entities then enter into the contract with Ugicom.

{¶ 37} 6. Some, if not all, of the installers and installer-owned business entities obtain their own BWC coverage. The Ugicom contract explicitly requires them to do so.

The record contains BWC premium payment certificates from 14 different installers for periods in 2008, 2009, and 2010.

{¶ 38} 7.  The auditor found that many of these installer accounts were not up to date in either address information or payments.

{¶ 39} 8.  Ugicom receives work orders from TWC and posts them to a website from which the installers select which jobs they wish to undertake.

{¶ 40} 9.  The installers furnish their own trucks, tools, and equipment including laptop computers and cell phones.  TWC or Ugicom furnishes the cable proper as well as some other materials including connection boxes mounted on the exterior of the customer's home or building.

{¶ 41} 10.  For occasional large jobs, Ugicom supplies heavier machinery at a charge to installers, on the theory that this equipment would not be economical for individual installers to own and operate on an infrequent basis.  In practice, most installers prefer to use hand tools to reduce the risk of damage to other underground utilities or electronic dog fences.

{¶ 42} 11.  If government permits are required for jobs, typically for small commercial work, Ugicom pulls the permit on behalf of the installer.

{¶ 43} 12.  Ugicom also uses the services of a single quality control inspector, Paul Lule, who checks the work of installers and reports any substandard work for correction. Ugicom considers Lule to be an independent contractor under terms like those of installers.

{¶ 44} 13.  TWC penalizes Ugicom for substandard work or damage to customer property, and Ugicom correspondingly may dock its installers for such problems or require corrective work.

{¶ 45} 14.  Ugicom provides no employment-related benefits such as health insurance, vacation time, or life insurance to the installers or inspector.  Ugicom pays the installers and inspector with an IRS 1099 form and withholds no taxes.

{¶ 46} 15.  TWC reviews and approves all new hires by Ugicom after a background check and drug screen.  The installers wear badges identifying them as authorized TWC contractors.  The name "Ugicom" does not currently appear on the badges but once did.

{¶ 47} 16.  By letter sent May 13, 2009, bureau premium auditor Mary Jo Eyink informed Ugicom that its account had been selected for an audit covering the period from

"1-1-05 through current date."  The audit period varies somewhat in subsequent documents.

{¶ 48} 17.  On December 10, 2009, auditor Eyink issued to Ugicom a notice of audit determination covering "audit period: 1/1/04 thru 6/30/09." This includes a schedule of audit findings covering ten one-half-year periods beginning January 1, 2004 and ending December 31, 2008.  Eyink determined that Ugicom had underreported payroll because the installers were employees rather than independent contractors.  The notice also assigns a more expensive manual classification for the installers.

{¶ 49} 18.  On April 2, 2010, the bureau issued an invoice to Ugicom indicating a balance due in the amount of $346,817.55.

{¶ 50} 19.  Ugicom protested the audit findings and invoice.  By letter dated April 1, 2010, auditor Eyink informed Ugicom that the audit results would stand:

> Your complaint received on 3/9/2010 protesting audit findings for the period from 1-1-04 through 6-30-09 [sic] has undergone a departmental review. Regrettably, the BWC has denied your request and the audit findings have been affirmed.
>
> The requirements for being an independent contractor are found in Ohio Revised Code Section 4123.01. BWC uses a factor test to determine employee/employer relationships. Because the following conditions apply: 1) a non compete clause, 2) requires notice to the other party for termination of the contract or non renewal of the contract, 3) requires the [Independent Contractor] to be responsible for tasks assigned by company on a day to day basis within a two hour response time to assignments, 4) risk supplies at its expense, supplies that are needed by the [Independent Contractor] to perform such services, 5) risk provides appropriate protection and security for equipment stored by the [Independent Contractor] at its warehouse[,] 6) the risk provides larger equipment needed for larger jobs, 7) the [Independent Contractor]'s services are integrated into the regular function of the risk, 8) a continuing relationship exists between both parties, 9) the [Independent Contractor] is required to make written reports on the computer each day showing progress and completion of work, 10) the [Independent Contractor] is paid on a regular basis for the work performed, 11) the risk paid relocation and housing expenses for some of the [Independent Contractor]'s, 12) the [Independent Contractor]'s were required to show the company's name on

their trucks and to wear badges reflecting the risk's name, 13) most of the [Independent Contractor]'s did not obtain Workers compensation insurance until 2008 and often had lapsed or cancelled policies, and 14) some of the 1099's indicated the same address as the risk, had no address or social security numbers listed. Based on these factors, we have determined that there was an employee/employer relationship.

{¶ 51} 20.  Ugicom applied for an adjudication hearing.  Following an August 26, 2010 hearing, the bureau's three-member adjudicating committee mailed an order on October 7, 2010 that denied Ugicom's protest.

{¶ 52} 21.  Ugicom appealed the order of the adjudicating committee and obtained a hearing before the administrator's designee.  The designee issued an order mailed September 30, 2011 upholding the adjudicating committee's order.

{¶ 53} 22.  The bureau continued to audit Ugicom for subsequent years and issued an invoice on September 21, 2012 in the amount of $471,369.95 including the prior assessment and adding amounts for July 2009 through June 2012.

{¶ 54} 23.  Ugicom commenced *Ugicom I* to obtain relief from the adjudicating committee's October 7, 2010 order as upheld by the administrator's designee.  This court issued a writ pursuant to a decision holding that the bureau had abused its discretion in applying R.C. 4123.01(A)(1)(c) to evaluate the installers' positions because that section applies only to construction contracts.  The court declined to reweigh the evidence heard by the bureau and ordered the administrator to vacate the designee's order, rehear the matter, and apply the common-law right-to-control test to determine the status of the installers.

{¶ 55} 24.  The adjudicating committee held a new hearing on November 4, 2015. The committee addressed the "protest period " of January 1, 2004 to June 30, 2009.  In addition to Ugicom's primary objection to classification of employees, Ugicom also argued that part of the audit period lay outside the two-year reachback term of Ohio Adm.Code 4123-17-17(C).

{¶ 56} 25.   The committee considered documentary evidence, including items submitted in the 2010-11 proceedings and heard live testimony, notably that of Fred Kibuuka and auditor Eyink.  The documents included summaries of all Ugicom IRS 1099

forms for the installers and inspector, some of their individual tax returns, Ugicom's W-3 transmittals, Ugicom's IRS 940 (unemployment tax) forms, and BWC's audit reports.

{¶ 57} 26.  Auditor Eyink appeared before the adjudicating committee to testify about her audit methods and findings.  She stated that during the initial audit, Ugicom issued IRS 1099 forms to approximately 20 to 25 persons including installers, Fred Kibuuka as operations manager, and Paul Lule as inspector.  The total amounts paid through IRS 1099 forms averaged $800,000 per year, while Ugicom's gross income during this period averaged $1,200,000.  For audit years 2004, 2005, and 2006, no one was on payroll, not even president Michael Kibuuka.  Auditor Eyink concluded that Ugicom installers and other personnel were employees because Ugicom controls the work to be performed and assigns tasks to specific individuals to be done on a daily basis.  The jobs must be completed within a two-hour window, and Ugicom reviews jobs for quality and takes corrective action.  Ugicom requires workers to log on to their assignment tracker daily to obtain work assignments and update the tracker at the end of the day.  Eyink noted that the skill level needed to perform the work is not characteristic of uniquely skilled crafts persons, the tools are simple, and, in sum, Ugicom controls the workers.

{¶ 58} Eyink also noted that when she audited Lule's personal income taxes, his declared income exactly matched the IRS 1099 form issued by Ugicom, so that all of Lule's income came from Ugicom, which was characteristic of a full-time employee rather than an independent contractor.  Eyink noted that Ugicom owned one, or possibly two, work vans that were used consistently by installers, although this represented a small proportion of vans in use by installers on a given day.

{¶ 59} 27.  Fred Kibuuka appeared by telephone before the adjudicating committee. He testified that Ugicom did not maintain liability insurance for the installers but only for itself.  The installers  were required to maintain their own individual liability insurance. Fred Kibuuka further testified that his installers physically connected the cable both at the service end and the house end in a connection box outside of the house.  Installers did not enter the house or verify the quality of television or internet service beyond obtaining a successful meter reading outside the house.   Installers obtained their badges from TWC after drug screenings and background checks, and installers who misplaced their badges would "pay a fine" to TWC.  The badge carries a number and anyone questioning the

installer's purposes could contact TWC for confirmation of badge validity.  Fred Kibuuka further testified that TWC provided a code and price for every variation of service involved in an installation job, payable to Ugicom, which would then establish a schedule of services payable to installers.  Fred Kibuuka's example was that drilling under a sidewalk might pay Ugicom $100, of which Ugicom would keep $20 and pay $80 to the installer.  Fred Kibuuka testified that Ugicom did not currently own any vehicles but, when pressed, conceded that at the time of the audit in 2009, Ugicom may have owned installation vans used by installers.  Because TWC required specified and specialized materials, installers would travel to the TWC warehouse to pick up the customized TWC materials such as cable connectors and connection boxes.  These materials would be ordered in advance of work for specific jobs using a request form submitted by the installer.  Ugicom did not specify which days the installers could work, and the installers, in fact, could work Sundays or holidays if desired and if the customers acquiesced.

{¶ 60}  28.  During Fred Kibuuka's testimony, the adjudicating committee noted a conflict between Kibuuka's description of how the installers obtained their materials from TWC and an affidavit submitted by Michael Kibuuka describing a procedure in which Ugicom itself placed a weekly order with TWC for customized materials.

{¶ 61}  29.  Fred Kibuuka stated that he himself was paid by IRS 1099 form during the audit period but was later advised by his attorney to switch to employee status and receive IRS W2 forms.  Counsel for Ugicom conceded before the adjudicating committee that Fred Kibuuka should have been an employee during the audit period.

{¶ 62}  30. The adjudicating committee issued an order on January 26, 2016 (erroneously timestamped as 2015) reinstating its prior determination that the contested workers are in fact Ugicom employees:

> Ugicom simply called its workers "independent contractors" to evade the obligations associated with having employees. The workers are vetted by TWC and given identification badges that lets customers of TWC know that Ugicom, a contractor for TWC, is on their property performing the work. TWC pays Ugicom for the service performed and Ugicom in turn pays the workers for their labor. The workers are not contracting with Ugicom to provide a specialized service that is not a part of the regular business of Ugicom.

Ugicom does not inform TWC that it considers the workers performing work on behalf of Ugicom to be "subcontractors" rather than employees of Ugicom. It is a requirement of TWC that the workers "label themselves so the customer who has scheduled a visit through Time Warner knows it's not just some random person that is showing up and says, hey, I'm going to be digging in your yard." (Tr. at 56). The workers were only able to obtain the badges because Mr. Kibuuka would send an email to TWC when he had a new person to be screened by TWC. Once "they are cleared by Time Warner, then he can start working for Ugicom." (Tr. at 61). The badge is registered with the TWC dispatch. (Tr. at 60). If there is an issue on the property and "the police queries who you are and the police call Time Warner, dispatch will identify that contractor works for Ugicom or any other company related to Time Warner." (Tr. at 61). Evidence was also submitted that showed a vehicle used by a worker with a sign on the door panel stating in conspicuous lettering: "Ugicom Enterprises, Inc., Contractor for Time Warner Cable." The workers are identified to the cable consumer, public, and TWC as being associated with Ugicom. If the workers were truly operating an independent business, they would hold themselves out to the public as the owner of the business he or she operates.

The Ugicom workers are not bidding on work like an independent contractor in the construction industry would bid on work. In the construction industry, a person maintaining their own separate business takes into consideration all of their expenses when pricing work in order to make a profit and is at risk of a loss. Here, TWC posts new work orders on its website per the territorial agreement with Ugicom and Ugicom then makes those work orders available on their own website. Ugicom then either assigns the jobs or the workers have the ability to select jobs. The workers may have some flexibility in accepting or selecting jobs. If flexibility exists in accepting or selecting work orders, that does not speak to whether the worker is performing the work in the service of Ugicom or as an "independent contractor." Any flexibility in this regard is just unique to the relationship Ugicom has with its workers. Employment status under R.C. 4123.01(A)(1)(b) is not limited to full time workers. Coverage is required for part time employees and casual workers earning more than $160.00 per calendar quarter. A casual worker is an individual whose work is occasional and not on a regular basis.

Paying the workers by the job instead of hourly, while more common in the case of independent contractors, also does not in itself control. The Committee asked Mr. Kibuuka to explain how the workers are paid. Mr. Kibuuka explained that if TWC paid Ugicom $100 to perform a job, then Ugicom would pay the worker $80, or 80%. There are various methods an employer may use when paying a worker. The most prevalent method is paid by the hour known as straight-time pay. However, some employers find that straight time pay is counterproductive to increasing efficiency in their industry. Ugicom's method based on each measurable piece of work completed is called "piece rate" compensation. Piece-rate basis compensation scheme can motivate employees to work more efficiently and is common for agricultural work, cable installation, writing, and carpet cleaning. This method of compensation is a clear indicator of *employment* as it is regulated by the Fair Labor Standards Act. See 29 C.F.R. §§ 778.109, 778.111. Per Schedule 1 of the "Independent Contractor Agreement," Ugicom can even change how much the workers are paid at any time without notice to the workers.

The ongoing relationship the workers have with Ugicom is a straightforward indicia of employment because the relationship contemplates continuing or recurring work. The high dollar amounts on the 1099s indicate a large volume of piece work is performed by the workers. A true independent contractor typically advertises and offers their services to the community at large. This is not occurring here. The worker is only able to do the work at the location of a cable consumer because they were approved by TWC to do work on behalf of Ugicom. Additionally, in the version of the contract provided to the auditor by Ugicom's then CPA there was a Non-Compete Provision forbidding the worker from doing cable installation work for a competitor of Ugicom. This control can be proper in certain employment relationships but is not a provision used in independent contractor relationships.

The fact that Ugicom had a select couple of its workers submit Affidavit's [sic] referencing the "Independent Contractor Agreement" as a "meeting of the minds" does not control. The underlying facts control. It is not enough that the employer requires an "independent contractor" agreement to be executed in order to obtain work. A person does not become an "independent contractor" based on how the employer characterizes the relationship. The nature of the relationship speaks for itself. In many situations, the fact that an employer uses a document called an "independent contractor"

agreement to characterize the relationship, rather than a contract for the performance of a certain piece or kind of work, is a red flag to look closely at the true nature of the relationship.

Ugicom is on the more sophisticated end of employers that have misclassified the labor for its business operation. Ugicom apparently requires the workers to either form an LLC or take out workers' compensation coverage. The fact that a worker paid the filing fee to form an LLC does not mean the worker is actually in business for themselves. Employers that misclassify employees sometimes require the worker to form an LLC before they "hire" the worker as an "independent contractor."

The fact that Ugicom may have also required individuals to obtain a "Certificate of Premium Payment" is not evidence speaking to the underlying facts of the nature of the relationship. Business owners may obtain the certificate by paying the $120 annual administrative fee to maintain an active account without electing to cover themselves. However, the state fund still has liability for the misclassified employees that were required to obtain a certificate in order to work for the employer. The auditor stated that none of the workers elected to provide workers' compensation insurance for themselves. (Tr. at 101). The misclassification typically is not challenged until a serious injury, or a death occurs, or an audit.

* * *

When an employer points to "right to control" factors, the workers are usually not performing services in an independent business, trade or profession. Ugicom's position is typical of an employer attempting to justify why they classified the labor for their business operation as "independent contractors." The employer ignores that the independent business or occupation of the worker is of "prime importance," while placing great weight on certain factors in the "right to control" test when the facts do not support the individual is in business for himself in the first place. That is the case here.

Ugicom points to facts that some expenses were first borne by the workers, such as vehicles, gasoline, cell phones, hand tools and a ladder. Pointing to these factors does not support that the workers are engaged in an independent trade, business, or

profession. It is not uncommon for employees to use their own vehicle or personal tools in an employment relationship and be reimbursed for mileage. An employer that has misclassified employees will not reimburse employees in the ordinary manner. Here, the workers are being paid for their labor and the compensation scheme obviously provides satisfactory compensation, or Ugicom would have no workers.

Mr. Kibuuka also stated TWC provides some standard guides on how the work is to be done and asserts Ugicom does not guide the workers "in any way whatsoever." (Tr. at 74). This is not the type of work where a supervisor must tell the worker where to dig a trench for each job order. The decisions the workers make on where and how to dig a trench to bury the cable line are the same decisions made by competent employees. Ugicom ultimately is responsible to TWC for the end result of the work performed by the workers. Ugicom inherently has an interest in how the work is done because TWC will fine Ugicom if work is not performed correctly. Ugicom even hired a quality control inspector to make sure the work is performed how it must be performed. Ugicom may not have to supervise each job, but it certainly has the *right* to control all aspects of the ongoing relationship with the workers.

### *Quality Control Inspector-Paul Lule*

The Committee finds Paul Lule, who is a quality control inspector for Ugicom, is in the service of Ugicom. Paul Lule originally did cable installation work for Ugicom. In 2009, he submitted a policy application stating he inspects the underground cable installed for Time Warner Cable. The auditor stated that she conducted an audit on the policy for Paul Lule and the income on his tax return matched the income on the 1099 that was issued by Ugicom. (Tr. at 22). Therefore, the sole income of Paul Lule was coming from Ugicom. (Tr. at 22). The work that Paul Lule was doing was not in a distinct occupation or business. Paul Lule only performs services for Ugicom and that type of quality control position is typically done by an employee.

* * *

For the above reasons, it is the decision of the Adjudicating Committee to DENY the employer's protest of the classification of workers the bureau determined were employees rather than independent contractors, but GRANT

the employer's protest on the time period of the audit. The audit time period shall only go back two years as permitted by Ohio Adm.Code 4123-17-17(C), making the audit time period July 1, 2007 through June 30, 2009.

(Emphasis sic.)

{¶ 63} 31. Ugicom again appealed pursuant to R.C. 4123.291 for a hearing before the Administrator's Designee, who heard the matter on September 1, 2016. The designee heard no new testimony regarding the adjudicative facts and relied on the arguments of the bureau and Ugicom representatives and the prior evidence adduced in the case. The designee released a decision on February 27, 2017 upholding the determination of the adjudicating committee:

> The Administrator's Designee notes that the Adjudicating Committee's order of November 4, 2015, is thorough, and contains a detailed discussion of the facts and relevant law of this case. Ugicom did not present any new first person testimony at the Administrator's Designee's hearing. Thus, the Administrator's Designee will adopt the facts and law from the Adjudicating Committee's order of November 4, 2015, and incorporate them in this order.
>
> * * *
>
> The Administrator's Designee finds that, under the common law test of [*Gillum v. Indus. Comm.,* 141 Ohio St. 373, 380-82 (1943)] and [*Bostic v. Connor,* 37 Ohio St.3d 144 (1988)], Ugicom exercises control over the workers and that the Bureau auditor's conclusion that the workers are employees is correct based on these facts and under the law.
>
> The fact that the cable installers do work *independently* at a job site does not mean that they are *independent contractors.* At each job site, the workers are expected to use their judgment and skill to dig the trench for the cable. The worker's decision on where and how to dig a trench to bury the cable line is not under direct supervision of a superior, but this is the type of decision that any competent skilled or unskilled employee makes daily in many occupations. Ugicom has a quality control inspector to make sure the work is performed how it must be performed so that Ugicom does not need to be on site to supervise each job, but Ugicom has the right to control its workers.

The Administrator's Designee also finds that the Bureau's determination in this case that Ugicom's workers are employees and not independent contractors is for the purpose of reporting Ohio workers' compensation payroll and premiums only, and this determination is not conclusive or binding on Ugicom for other payroll reporting obligations, such as to the Internal Revenue Service for taxes or to the Ohio Department of Job and Family Services for unemployment compensation.

Conclusion

Therefore, the Administrator's Designee DENIES the employer's appeal and AFFIRMS the decision of the Adjudicating Committee.

(Emphasis sic.)

{¶ 64} 32. For the initial 2010 hearing before the committee, Joel Wilson, CPA, prepared a two-page letter or written statement dated October 20, 2009 that is addressed to auditor Eyink. This statement remained in the record for the 2015-17 proceedings:

There were no payrolls for years 2004, 2005 and 2006. Amounts reported to Ohio BWC were for the President's draw.

* * *

Attached is a copy of the Contract of Services Agreement required to be read and signed by all independent contractors. The conducting of business with independent contractors as subcontractors is common for the TV cable installation business.

Independent subcontractors own mostly the mini walk-behind vibrator plow. Whereas, Ugicom Enterprises, Inc. owns the bigger sit-on plow machines for seldom bigger jobs. The sit-on plow's high cost would be an extreme burden to the independent subcontractors. Ugicom rents the bigger sit-on plow to the subcontractor at a reduced rate.

Concerning duties of the President: The President is the main liaison between Time Warner Cable and Ugicom Enterprises Inc. The President has performed the marketing, sales and executive communications. On a daily basis, the President gets the batches of jobs from the Time Warner Cable website and puts the jobs on the Ugicom Enterprises Inc. website and

then assigns specific jobs to each individual subcontractor's web page. Each subcontractor pulls the jobs from their web page and independently performs the job. Once the job is complete, the subcontractor returns to Ugicom's website and keys in all pertinent information to demonstrate that the job is closed out. The President, then transfers the closed out job information back to the Time Warner Cable site.

Concerning duties of Daily Manager: The Daily Manager's role is to assure that the jobs are finished and on time. The Daily Manager performs some office coordinations and clears disputes with Time Warner.

Clarification of Operations and Operations of the Subcontra[c]tors: Except for the manual and physical cable installation of the subcontractors and some office coordination, the business runs as web-based virtual offices with all jobs communicated by websites.

Time Warner has a website that it provides batches of jobs to Ugicom (through Ugicom's window on Time Warner's website).

Ugicom has a 21st century web-based system for distributing jobs to independent subcontractors to start jobs. Ugicom organizes the jobs and downloads the jobs to each subcontractor's customized web page. Ugicom's web-based system also provides the means for the subcontractor to close the job once the job is finished (by the subcontractor keying information into the subcontractor's web page). In between the start and finish of the job, the subcontractor has total independence to complete the job according to specifications without supervision.

On a daily basis, the subcontractor goes to his website before day every morning, prints the jobs to be performed with addresses and specifications. The subcontractor provides his own transportation, tools and equipment to complete the job. In the evening, the subcontractor goes back to the website and closes the job.

All work is underground. All work is itemized with codes, descriptions and standardized related pay. Description examples include wire under sidewalk, wire under driveway, wire under flower bed and many others. Each of the previous descriptions have related codes and pay. Therefore, when a

subcontractor closes out a job, the subcontractor will know their pay to be received immediately.

Additional Points about Virtual Web-based System:

- Communications are by website and email
- Everyone is required to have their own laptop, cell phone, tools and equipment (except for rare huge jobs requiring large and expensive equipment)
- Can literally work from anywhere
- Some subcontractors have not been seen for two years

{¶ 65} 33. On February 19, 2010, Michael Kibuuka signed a two-page unsworn statement that was sent to the bureau's audit department. The statement provides details of his business organization and was in evidence in later proceedings:

[Three] As the President, I am the main liaison between the Company and Time Warner Cable. I receive a salary for my services. I receive a W-2 at the end of each year. Ugicom pays workers' compensation coverage for me.

[Four] Ugicom contracts with Independent Contractors ("Contractors") to install the cable lines. Ugicom pays the Contractors based on the jobs they perform.

[Five] On a daily basis, Ugicom downloads its work orders from TWC's website for the Greater Cincinnati and Dayton areas. These jobs, in turn, are placed on Ugicom's website, www.ugicom.com, for the Contractors to select at their discretion. All work is itemized with codes and descriptions to allow the Contractor to understand the type of job that is required (i.e., wire under sidewalk, wire under flower bed, wire under driveway). Each Contractor is responsible for selecting the jobs the Contractor wishes to perform and thereafter independently performing the job. Ugicom does not control the manner in which the Contractors select or perform their jobs. Once the Contractor completes the job, he or she keys into Ugicom's website the pertinent job information and closes out this particular job. Ugicom created its website in 2002.

[Six] On a weekly basis, Ugicom pays the Contractors based on the number and type of jobs completed during the prior work week. Ugicom pays per the job that is performed. Ugicom does not make any deductions. At the end of the year, the Company issues 1099 forms to its Contractors.

[Seven] The Contractors purchase and own their own transportation, tools, and equipment necessary to install the TWC cable lines. The Contractors are responsible for their own liability insurance. The Contractors pay for their own gas, transportation costs, and cell phones. Ugicom does not provide any financing for the purchase of the above items.

[Eight] The Contractors have a sticker on their transportation which states "Ugicom Enterprises Inc. — Contractor for Time Warner Cable." The Contractors also wear a TWC badge which states they are a contractor for Time Warner Cable. The Contractors occasionally wear a highly visible construction vest that is labeled "Cable TV" and "Contractor for Time Warner Cable." Ugicom does not issue or require uniforms for the Contractors.

[Nine] The Company has entered into a contract relationship with Fred Kibuuka to manage and maintain Ugicom's website. He posts the TWC jobs onto Ugicom's website for selection by the Independent Contractors. The Company issues Fred Kibuuka a 1099 at the end of the year for his services. Fred Kibuuka is not an employee of Ugicom as it does not control the manner in which he manages and maintains the website.

[Ten] Ugicom requires its Contractors to obtain their own workers' compensation coverage through the State of Ohio. The Company has implemented a system on its website in which the Contractors are required to confirm their workers' compensation coverage. Without this confirmation of workers' compensation coverage, the Contractor is unable to access Ugicom's website and obtain new jobs.

[Eleven] Ugicom communicates with its Contractors via their website and telephone communications. The Company rarely meets in person with the Contractors.

[Twelve] TWC requires its subcontractors to use its material (i.e. cable lines) for the outside installation. Accordingly, Ugicom places an order with TWC on a weekly basis for the materials that are necessary for the jobs. One of the Contractors arranges on his own to pick up this material from TWC's warehouse and distributes it to the other Contractors. Ugicom is not involved with this distribution process.

[Thirteen] As part of its contract with TWC, Ugicom has agreed not to work for other cable companies in the

installation of outside cable lines. In order to maintain this non-compete relationship with TWC, Ugicom requires its Contractors to only perform outside installation of cable lines for Ugicom and TWC. These Contractors are free to work for other companies who install outside lines (i.e. the telephone company, the gas and electric company) as long as it does not involve cable line installation. The prohibition is only for cable lines.

[Fourteen] I have asked the Contractors to sign Independent Contractor Agreement memorializing this relationship. See agreement attached as Exhibit 1.

{¶ 66} 34. As part of the earlier proceedings, on February 18, 2010, Roger Sengendo, a Ugicom installer, executed an affidavit describing his working conditions:

[One] I am an Independent Contractor ("Contractor") for Ugicom Enterprises Inc. ("Ugicom"). I have worked as a Contractor for Ugicom for approximately three years.

[Two] Previously, I was an independent cable installer with another company in Texas.

[Three] In addition to contracting with Ugicom, I also am a retailer on the internet.

[Four] For Ugicom, I install outside cable lines for Time Warner Cable ("TWC"). I feed the lines from the main outside cable box to apartments, homes, and businesses for TWC customers.

[Five] I use my own equipment and tools to dig underground to install the cable lines. Depending on the job, I bore under sidewalks, under driveways, or through flower beds. I have purchased the equipment and tools on my own.

[Six] Ugicom pays me based on the number of jobs I perform each week. Each job is priced differently based on the type of job. At the end of the year, Ugicom issues me a 1099 tax form. Ugicom does not deduct for any taxes.

[Seven] As a Contractor, I pay my own taxes (self employment, etc.) and carry my own insurance, including Ohio workers' compensation insurance.

[Eight] Ugicom utilizes a website to communicate to its Contractors about available jobs. I primarily utilize this

website to communicate with Ugicom. The Company posts the available jobs on its website. I am free to choose any available job or not to perform any jobs on a given day. I control when and how I perform a particular job. Based on my prior experiences, I know how to install outside cable lines.

[Nine] Each day, I log into Ugicom's website via my home computer and select the particular jobs I want to perform. I thereafter independently complete the jobs. After I complete the jobs, I log into the website and indicate my completion of the jobs. On average, I complete ten jobs per day, depending on the weather.

[Ten] I have performed jobs through the Greater Cincinnati and Dayton areas.

[Eleven] I use my own van to travel to the job sites. I pay for my own travel costs (gas, insurance, etc.). I also have my own cell phone. For identification purposes, I have a sticker on my van which reads: "Ugicom Enterprises Inc. — Contractor for Time Warner Cable."

[Twelve] I have obtained my own workers' compensation coverage through the State of Ohio. * * * I contacted the BWC office via the phone and obtained my coverage through the bureau's website.

[Thirteen] I do not wear a uniform. For identification purposes, I wear a badge stating "Contractor — Time Warner Cable." I also wear a brightly colored construction vest which reads "Cable TV" and "Contractor for Time Warner Cable."

[Fourteen] On occasion, as needed, I communicate with one of TWC's technicians for advice if I have a technical problem with a job.

[Fifteen] At times, I work with other Contractors on a job if I am really busy or if it is [a] large job. I directly coordinate with the Contractor if I need the assistance.

[Sixteen] I do not consider myself an employee of Ugicom. Ugicom does not exercise any control over my day-to-day activities. I decide on the number of jobs I will perform and the particular jobs I will perform in any given day. I work independently and am self-employed.

{¶ 67} 35. On February 18, 2010, Michael Lwanga, another Ugicom installer, executed an affidavit that reads similar to the Sengendo affidavit.

{¶ 68} 36. An example of the Ugicom installer contract is in the record, captioned "Ugicom Enterprises Independent Contractor Agreement," and executed by Michael Lwanga:

> Whereas the Company desires [to] retain the services of the Independent Contractor to **install Cable technology in the *Company's area of business operations*** the Independent Contractor represents itself as competent and qualified to accomplish the specific requirements of this contract to the satisfaction of the Company therefore this contract is entered into under the following terms and conditions:
>
> [One] The Contractor agrees to perform the services described in the attached "Scope of Services" contained in Schedule 1 to this Contract.
>
> [Two] Terms of Contract: The term of this contract is one year effective September 1, 2009 ending August 31, 2010. Notwithstanding the agreement term, the Company may terminate this Agreement for non-performance of services, breach of the company policies without notice and without regard to the Agreement term. Parties by mutual agreement may renew the agreement term unless either party gives the other party two weeks' notice of intent of non-renewal of the Agreement.
>
> [Three] Payment:
>
> A. <u>Amount of Payment</u>: Each cable installation shall carry a unique service code(s) in Schedule 2 to this Agreement. The Company shall pay the contractor once a week by direct deposit upon logging the contractor's services. The Company shall compensate the Contractor for the services in accordance with the payment rates set in Schedule 2 to this Agreement. These rates are subject to change at any time without notice by the Company.
>
> B. <u>Mode and Manner of Payment</u>: The Company will make out payment to The Independent Contractor, on the first business day of every month to the address in the recitals to this Contract.

C. <u>Third Party Billables</u>: Contractor will submit to the Company any payments made for purchases from third parties for items not covered in this contract. This section covers items costing more than $100.00 (One hundred dollars and zero cents only). Any such purchases will only be made with the prior express consent of the Company. Third party receivables will be payable no more than 30 days after being invoiced by Contractor.

* * *

[Four] <u>Termination</u>: Either party may terminate the contract without cause by giving 60 days written notice to the other party. All outstanding dues must be paid upon effective date of termination.

[Five] <u>Breach of Contract</u>: If Contractor fails to fulfill his/her obligations, The Company may terminate this contract by giving 30 days written notice to the Contractor of intent to terminate the contract. The Company must give Contractor a reasonable period to remedy any alleged breach prior to the lapse of the thirty day period. Contractor may terminate contract by giving 10 days written notice for non-payment of bills due, as specified in Schedule 1 to this Contract.

[Six] <u>Confidentiality</u>: All business related information including personal information, trade secrets, information labeled "For official use only", received during the course of business shall remain confidential and proprietary. No disclosure shall be made to third parties of this information without the express consent of the owner of such information.

[Seven] <u>Indemnification</u>: The independent contractor shall obtain liability insurance indemnifying and holding the Company harmless against all liability set forth to cover the following risks: _____ all _____. The independent contractor shall carry the following minimum limits _ two million _. Ugicom shall be listed as the additional insured. The Independent contractor shall maintain this coverage at all times and failure to maintain coverage shall be grounds for termination of employment. In consideration thereof, the Company shall advance the Contractor such payment as are required to obtain the coverage immediately upon the signing of this Agreement. This advance shall be recoverable from the Contractor's net pay. This policy shall insure the Contractor against any claims for errors, omissions or general liability for

actions done in the ordinary course of performance of duties under this Contract.

[Eight] <u>Governing Law</u>: This contract shall be governed by the laws of the State of Ohio and applicable federal law. All disputes under this Contract shall be subject to mandatory arbitration under the laws of the State. The venue for arbitration under this contract shall be in the city of Cincinnati in the State of Ohio. The arbitrator's ruling shall be final as to liability. Each party will bear its own costs.

[Nine] <u>Mandatory Arbitration</u>: Any disputes under this contract save for non-payment of services shall be subjected to mandatory arbitration under the Commercial Arbitration Rules of the American Arbitration Association in force at the time of lodging of a claim for arbitration. Arbitrator's award including an order for costs shall be final and non-appealable in a court of law.

(Emphasis sic.)

<u>Discussion and Conclusions of Law</u>:

{¶ 69} In order for this court to issue a writ of mandamus, relator must show a clear legal right to the relief sought, a clear legal duty on the part of the respondent to provide such relief, and the lack of an adequate remedy in the ordinary course of the law. *State ex rel. Pressley v. Indus. Comm.*, 11 Ohio St.2d 141 (1967). The writ of mandamus will not lie to compel a public body or official to reach a certain outcome in a discretionary matter. *State ex rel. Crabtree v. Franklin Cty. Bd. of Health*, 77 Ohio St.3d 247 (1997). In this case, Ugicom must establish that the designee's order is contrary to law or constitutes a gross abuse of discretion because it is not supported by any evidence contained within the administrative record. *State ex rel. Elliot v. Indus. Comm.,* 26 Ohio St.3d 76, 78-79 (1986).

{¶ 70} Because the initial protest issues have been somewhat narrowed through concessions by both parties in the administrative proceedings, the sole remaining issue in this case is whether the designee abused his discretion in determining Ugicom's cable installers and installation inspector were employees rather than independent contractors, thereby requiring Ugicom to include their compensation for purposes of determining the appropriate premium for workers' compensation coverage. Finding that the designee has not abused his discretion when applying the common-law test to determine whether

workers are employees or independent contractors, it is the magistrate's decision for the reasons that follow that no writ shall issue in this case.

{¶ 71} The threshold issue in determining whether workers are employees or independent contractors is the amount of control exercised by the employer over the manner and means of performing the work. *Gillum v. Indus. Comm.,* 141 Ohio St. 373, 380-82 (1943). In making this distinction, the Supreme Court of Ohio in *Gillum* identified the following pertinent factors:

> In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered:
>
> (a) the extent of control which, by the agreement, the master may exercise over the details of the work;
>
> (b) whether or not the one employed is engaged in a distinct occupation or business;
>
> (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
>
> (d) the skill required in the particular occupation;
>
> (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
>
> (f) the length of time for which the person is employed;
>
> (g) the method of payment, whether by the time or by the job;
>
> (h) whether or not the work is a part of the regular business of the employer; and
>
> (i) whether or not the parties believe they are creating the relationship of and servant."

*Id.* at 381-82, quoting 1 Restatement of the Law of Agency, Section 220. When examining application of these factors, however, the court will review the totality of the circumstances. *Id.* The Supreme Court's test stated in *Gillum* was restated without important modification in *Bostic v. Connor,* 37 Ohio St.3d 144 (1988):

> [W]ho controls the details and quality of the work; who controls the hours worked; who selects the materials, tools and personnel used; who selects the routes travelled; the length of employment; the type of business; the method of payment; and any pertinent agreements or contracts.

*Id.* at 146.

{¶ 72} The adjudicating committee and designee in this case reviewed the evidence in detail and found that the installers and inspector, on balance, were sufficiently controlled by Ugicom to be employees rather than independent contractors. There is some evidence to support this conclusion, and it is not contrary to law.

{¶ 73} Notably, the installers in this case, in practice if not in theory, were demonstrated to work exclusively for Ugicom. "[O]ne of the basic elements of the independent contractor relationship is the fact that the contractor has an independent business or occupation." *Gillum* at 377. This is of "prime importance." *Id.* Although the contractual restriction on installers performing side-work was limited to TWC and Ugicom competitors, this in practice functioned as a restriction on outside cable installation work since the workers in question were limited in skills, training, and equipment to the very basic cable installation work furnished by Ugicom. There was no evidence that workers had a distinct occupation or business apart from Ugicom, and substantial evidence provided by the auditor that in fact the installers and inspector limited their enterprise in this field to the Ugicom work. As noted by the adjudicating committee and the designee, the hallmark of independent contractors would be that they offer their services, through advertising or otherwise, to the community at large.

{¶ 74} Ugicom also controlled and supervised the details, hours, and quality of work to a degree inconstant with independent contractors. Although Ugicom was able to demonstrate some latitude on the part of the installers regarding when and where they would work, Ugicom installers took their assignments off of the Ugicom website and once they accepted a job, responded within a set time period. They then notified Ugicom of completion. All work was done according to TWC and Ugicom standards. There was no evidence given that installers could materially vary the means of completing a successful installation.

{¶ 75} The workers maintained an ongoing relationship with Ugicom, referring to their computers daily to obtain work, using their personal Ugicom sign-in codes, and continuing for most workers over a course of years doing the same type of work.

{¶ 76} Nor were the skills required for this particular work inherent to an experienced independently operating professional. The installers generally used hand tools and basic, easily acquired skills to complete an installation according to the precise parameters established by TWC and Ugicom.

{¶ 77} In contrast, the evidence was unrebutted that installers furnished all or nearly all their tools for the great majority of the work. This factor did weigh in favor of a finding of independent contractors.

{¶ 78} However, installers were paid according to a set schedule and had no input regarding the pay scale for any particular job. Ugicom, by reference to what it received from TWC, set a piece work pay rate that was not negotiated by the installers or inspector, and there was no indication that installers had any control over the rate of pay or could bid on jobs on an independent pay scale, other than simply refusing work that appeared unprofitable.

{¶ 79} Finally, the adjudicating committee and designee properly refused to give any conclusive weight to the existence of a written agreement between the installers and Ugicom labeled "Independent Contractor Agreement." The determination here under the common-law test stands in contrast to such determinations for purposes of participation in Ohio's public retirement plans, which are made subject to statutorily defined factors that specifically emphasize any contractual agreement between employer and worker. *See, e.g.*, *State ex rel. Schaengold v. Ohio Pub. Emps. Retirement Sys.*, 114 Ohio St.3d 147, 200-Ohio-3760; *State ex rel. Curtin v. Ohio Pub. Emps. Retirement Sys.*, 10th Dist. No. 09AP-801, 2011-Ohio-2536, ¶ 20; *State ex rel. Sales v. Ohio Pub. Emps. Retirement Bd.*, 156 Ohio St.3d 433, 2019-Ohio-1568, ¶ 19 (all applying Ohio Adm.Code 145-1-42(A)(2)).

{¶ 80} While no cases directly on point for BWC determinations in Ohio have been cited by the parties, comparable federal case law under the Federal Fair Labor Standards Act ("FLSA") is clear that imposition of an independent contractor agreement as a condition of obtaining work will not preclude employee status:

> It is well settled that the economic realities of an individual's working relationship with the employer—not necessarily the

label or structure overlaying the relationship—determine whether the individual is an employee under the FLSA. *See, e.g., Tony & Susan Alamo Found. v. Secy. of Labor*, 471 U.S. 290, 301 (1985); *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 32-33 (1961); *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729 (1947); *Dole v. Snell*, 875 F.2d 802, 804 (10th Cir. 1989) ("[T]he Supreme Court has directed that the economic realities of the relationship govern."). In determining whether an individual is an employee under the FLSA, the inquiry is not limited to the contractual terminology between the parties or the way they choose to describe the working relationship. *See Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 570 (10th Cir. 1994); *Dole*, 875 F.2d at 804. Other circuits have adopted this same rule. *See, e.g., Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1311 (11th Cir. 2013) ("[The] inquiry is not governed by the 'label' put on the relationship by the parties or the contract controlling that relationship."); *Secy. of Labor v. Lauritzen*, 835 F.2d 1529, 1544-45 (7th Cir. 1987) ("The FLSA is designed to defeat rather than implement contractual arrangements. . . . '[E]conomic reality' rather than contractual form is indeed dispositive."); *Robicheaux v. Radcliff Material, Inc.*, 697 F.2d 662, 667 (5th Cir. 1983) ("[A]n employee is not permitted to waive employee status," despite having signed independent contractor agreements.).

*Acosta v. Jani-King of Oklahoma, Inc.*, 905 F.3d 1156, 1159-60 (10th Cir.2018).

{¶ 81} In sum, an employer may not establish an independent contractual relationship with persons who would otherwise be deemed employees for purposes of workers' compensation coverage simply by self-designating this category and interposing a contract. As noted by the adjudicating committee during discussion, the risk remained that the bureau would be obliged to extend coverage to an installer after injury on the job, and Ugicom's designation of them as independent contractors rather than employers would not be binding in that decision.

{¶ 82} Likewise, formation by the putative employee of an LLC or corporation to contract with the putative employer, as required by Ugicom here, does not insulate Ugicom from an ultimate determination that the persons working through that LLC or corporation are in fact employees for purposes of workers' compensation coverage. When assessing employee status, "the fact that these individuals are franchisees or have formed corporations does not end the inquiry." *Id.* at 1160. Again, the economic realities of the

employment relationship must be assessed without regard to form.  Interposition of an "employee corporation" does not of itself prohibit a finding that the employee was not an independent contractor under the other common-law factors.

{¶ 83} Accordingly, it is the magistrate's decision that this court not issue a writ of mandamus in this matter because the administrator's designee did not abuse his discretion in determining that the workers at issue were employees rather than independent contractors.

/S/ MAGISTRATE
MARTIN L. DAVIS

**NOTICE TO THE PARTIES**

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).